STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-968

SWIFT ENERGY OPERATING, L.L.C.

VERSUS

PLEMCO-SOUTH, INC., ET AL.

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2011-491
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE AD HOC

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Shannon J. Gremillion, Judges.

AFFIRMED.

Stephen D. Marx
Chehardy, Sherman, Ellis, Murray, Recile, Griffith, Stakelum & Hayes, LLP
One Galleria Boulevard, Suite 1100
Metairie, LA 70001
(504) 833-5600
COUNSEL FOR DEFENDANT/APPELLANT:
    Factor King, LLC

**Craig R. Hill**
**Jones & Hill**
**P. O. Box 1260**
**Oberlin, LA 70655**
**(337) 639-2127**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Factor King, LLC**

**Thomas P. LeBlanc**
**Loftin, Cain & LeBlanc, L.L.C.**
**113 Dr. Michael DeBakey Drive**
**Lake Charles, LA 70601**
**(337) 310-4300**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Swift Energy Operating, LLC**

**PETERS, J.**

Factor King, LLC (Factor King), who is both defendant and plaintiff-in-reconvention in this litigation, appeals a trial court judgment denying its motion for summary judgment and granting the motion for summary judgment of plaintiff and defendant-in-reconvention, Swift Energy Operating, LLC (Swift Energy), and dismissing all claims by Factor King against Swift Energy. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The facts are not in dispute and are set out in the affidavits, attachments, and stipulations presented to the trial court in support of, and in opposition to, the summary judgment motions. Although the litigation before us is between Factor King and Swift Energy, it originates from a contractual relationship between Swift Energy and Plemco-South,[1] an Oakdale, Louisiana oilfield service company. On April 1, 2002, Swift Energy,[2] which is a Houston, Texas oil and gas exploration company, and Plemco-South entered into a Master Service Agreement, whereby Plemco-South agreed to provide goods, services, and rental equipment to Swift Energy for use in its business activities in exchange for payment by Swift Energy. The process for payment of Plemco-South's invoices was simple. When the goods, services, and/or rental equipment were provided, Plemco-South would submit the appropriate documentation to Swift Energy's field supervisor, who would approve the charges and forward the documentation to Swift Energy's Houston, Texas

---

[1] The Master Service Agreement identifies the service company as "Plemco-South." Other documents identify it as "Plemco-South, Inc." or "Plemco-South, Incorporated." Additionally, some of the correspondence in the record refers to an entity identified as "Plemco Energy Services[,]" which appears to be a companion organization with Plemco-South. However, it is not disputed that the party at interest in the litigation is "Plemco-South, Inc."

[2] The actual party to the contract was Swift Energy Company, but it is not disputed that Swift Energy Operating LLC was the successor party to the contract at the time this litigation arose.

corporate headquarters for approval by either the Operations Department or the Facilities and Construction Department. After approval by the appropriate department, the documentation would be submitted to the Accounts Payable Department for processing and payment. According to Randy Bailey, Swift Energy's vice-president of Production, Swift Energy has service contracts similar to its contract with Plemco-South in Louisiana and Texas, and the size of its operation requires that the payment procedure be the exclusive method of handling accounts receivable. In its ordinary course of business, it has never been acceptable for an account receivable to be submitted directly to the Accounts Payable Department.

For approximately nine years, the business relationship between Swift Energy and Plemco-South functioned without any problems. This litigation arises because on July 27, 2011, Plemco-South entered into a written Factoring and Security Agreement (Factoring Agreement) with Factor King, a Hauppauge, New York corporation, whereby Plemco-South sold Factor King some of its accounts receivables.[3] In order to assure that Factor King would recover the amount advanced for the purchase, Plemco-South granted Factor King a "continuing first priority" security interest over all of its property of value, including any existing or future acquired accounts receivable.[4] Despite the creation of this security interest under Section 7.1 of the Factoring Agreement, Section 7.2 provides that "[n]otwithstanding the creation of this security interest, the relationship of the

_____

[3] Factor King is in the business of advancing money to parties by purchasing the accounts receivables of the borrowing party.

[4] Section 7.1 of the Factoring Agreement provides for the security interest, and Section 1.8 defines the collateral subject to the security interest as being "all Seller's now owned and hereafter acquired Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, and General Intangibles."

parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower."

With regard to the authority granted Factor King under the collateral assignment, Section 9 of the Factoring Agreement authorized Factor King to, among other things, accept and deposit on behalf of itself or Plemco-South the "proceeds of any Collateral" and to take steps to collect the accounts made a part of the assignment; to notify the accounts receivable debtor that the collateral assignment existed; and to file any financing statements under Section 9 of the Uniform Commercial Code.

However, the primary obligation under the Factoring Agreement, to notify the account debtor, fell upon Plemco-South. Section 11.3 required Plemco-South to mark any invoice sent to an account debtor with the following notice:

> **NOTICE OF ASSIGNMENT**
> **ASSIGNED AND PAYABLE ONLY TO:**
> FACTOR KING, L.L.C. FBO
> Plemco-South, Inc.
> PO Box 95000-1183
> Philadelphia, PA 19105-0001
> Any claims, offsets, or disputes
> Must be reported immediately to
> FACTOR KING 888.919.770

In fact, Jason Gross, president of Factor King, stated, in his affidavit in support of Factor King's motion for summary judgment, that when entering into a factoring arrangement with a party, "[b]efore any money is advanced to any Borrower, the Borrower's customers, the Account Debtors, are put on notice *by the Borrower* that its accounts receivable have been assigned to Factor King, and that the Account Debtor must pay Factor King directly." (Emphasis added.)[5]

---

[5] The use of the word "Borrower" in Mr. Gross' affidavit directly challenges the attempt in Section 7.2 of the Factoring Agreement to categorize the relationship as that of "Purchaser and Seller." The attempt to so characterize the relationship further fails when one considers the true

3

Two days after the execution of the Factoring Agreement, Factor King recorded a document entitled "UCC Financing Statement" (Financing Statement) in the public records of Allen Parish, Louisiana. The Financing Statement identified the secured party as Factor King, LLC; the debtor as Plemco-South, Inc.; named Plemco Energy Services as an additional debtor; and described the collateral covered by the Financing Statement as "[a]ll present and future assets of the Debtor."

Plemco-South did not sell Factor King any of the accounts receivable generated by its business relationship with Swift Energy. Thus, the only connection between Swift Energy and Factor King in the Factoring Agreement involved the assignment of Plemco-South's assets to Factor King as collateral for the transaction. In fact, the first time Swift Energy became aware that Plemco-South was involved in any financial maneuvering came from Plemco-South, not Factor King, on August 4, 2011. On that day, John Wesley Stigall, Plemco-South's Chief Executive Officer, emailed Cynthia Keo, Swift Energy's Accounts Payable Supervisor, informing her that Plemco-South needed an accounts payable summary because it was reconciling its accounts payable and changing its line-of-credit provider. In that same email, Mr. Stigall requested that Ms. Keo expedite payment of Plemco-South's outstanding invoices, but did not mention the Factoring Agreement. With regard to this latter request, Ms. Keo informed Mr. Stigall that all invoices would be processed for payment following the procedures that had been in place for the entire term of the contract between Plemco-South and Swift Energy.

nature of the Factoring Agreement, which is to provide Plemco-South with operating capital. While it is true that Factor King "purchased" some of Plemco-South's accounts receivable, the purchase was secondary to its security interest in in all of Plemco-South's assets. That security interest guaranteed Factor King that either it would receive a one hundred percent return on its investment or Plemco-South would be dissolved as a business entity.

4

Approximately two weeks later, on August 18, 2011, Monica Gleberman, a Factor King employee, emailed Ms. Keo two documents related to the Factoring Agreement. The first is entitled "**Notice of Assignment and Change of Payee.**" This document bore Plemco-South's Oakdale, Louisiana address, was signed by Plemco-South's President, John Durant, and provided, in pertinent part:

> We are pleased to inform you we have established a working relationship that provides Plemco-South, Inc. with a working capital line of credit. These funds will enable further growth and expansion from which we and our customers will benefit, both now and in the future. Accordingly, we have assigned all present and future Accounts Receivable with your company to Factor King, LLC.

The document further authorized and instructed Swift Energy to pay all of its invoices directly to Factor King and stated that "[p]ayments made to any other party except Factor King, LLC will not relieve your obligation for Accounts Payable due Plemco-South, Inc., and this notice may not be revoked except in writing by an officer of Factor King, LLC." Below Mr. Durant's signature was an acknowledgment section for the appropriate official at Swift Energy to execute.

The second document emailed to Ms. Keo is identified as an "**Invoice Acknowledgment Form.**" Although it clearly was made a part of the email, we do not find a copy of the form in the record before us.

In her email, Ms. Gleberman requested that Ms. Keo review, sign, and return the documents to Factor King. Without reviewing the attached documents, Ms. Keo telephoned Ms. Gleberman and informed her that she (Ms. Keo) did not have the authority to execute the documents and that Ms. Gleberman should process her request through Swift Energy's Operations and Facilities and Construction Departments, which did have such authority.

Seven days later, on August 25, 2011, Mr. Stigall emailed Ms. Keo to inform her that Plemco-South would cease operations the next day due to the ill

health of its owner and that Plemco-South had sold some of its accounts receivable to Factor King. Mr. Stigall requested in the email that Ms. Keo sign off on Factor King's two documents forwarded to Ms. Keo by Ms. Gleberman so that Plemco-South could receive payment from Factor King. Ms. Keo responded to Mr. Stigall with the same message she had related to Ms. Gleberman: that she lacked the authority to sign the documents and that Plemco-South and/or Factor King must pursue their request through the appropriate Swift Energy department.

The next day, Gary Reed, a senior manager in Swift Energy's Facilities and Construction Department, learned that Plemco-South was ceasing operations and that the corporation requested expedited payment of the funds owed it by Swift Energy. Four days later, on August 29, 2011, Peter Zonneveld, a Swift Energy employee, informed him that Swift Energy had outstanding invoices owed to Plemco-South of approximately $87,000.00; and that Mr. Zonneveld had received a verbal report that a Plemco-South supplier had not been paid. In response to this report, Henal Patel, in-house counsel for Swift Energy, prepared a release and waiver of lien claims in the form of a Letter Agreement to be executed by Swift Energy and Plemco-South, when and if Swift Energy decided to pay the outstanding invoices.

Mr. Reed approved payment of Plemco-South's outstanding invoices, and on September 2, 2011, Mr. Stigall traveled to Houston, Texas; picked up a check made payable to Plemco-South in the amount of $87,865.64 from Swift Energy; and executed the release and waiver prepared by Mr. Patel. Mr. Patel and Randy Bailey, vice president of production for Swift Energy, were present at the meeting when the check was delivered. Neither Mr. Patel nor Mr. Bailey had any prior knowledge of the Factoring Agreement between Plemco-South and Factor King,

6

and Mr. Stigall made no mention of the relationship during the meeting. In the Letter Agreement, Mr. Stigall asserted on behalf of Plemco-South that all subcontractors and suppliers had been paid, no liens affecting Swift Energy's property had been filed and there existed no grounds for any such lien, and that Plemco-South would hold Swift Energy harmless for any claims against the funds paid.

Craig Gross, a Factor King representative, emailed Ms. Keo complaining that the September 2, 2011 payment to Plemco-South should have been paid to Factor King. The email went directly to Ms. Keo's "junk mail" section of her computer and she did not see the email until after she was instructed by Mr. Patel, on October 6, 2011, to review her emails for any correspondence from Factor King. Mr. Patel made this request to Ms. Keo because, on October 4, 2011, he had been told by Roberta Taflinger, a Swift Energy paralegal, that Mr. Gross had contacted her by telephone and informed her that Factor King was taking the position that Swift Energy had made payments to Plemco-South which should have been paid to Factor King.

At Ms. Taflinger's request, Mr. Gross emailed her a copy of the documents that had previously been emailed to Ms. Keo on August 9, 2011, and Ms. Taflinger forwarded these documents to Mr. Patel. After receiving and reviewing these documents, Mr. Patel emailed Mr. Gross and informed him that pursuant to Swift Energy's contract with Plemco-South, no assignment of the agreement was valid absent Swift Energy's prior written consent.[6] Mr. Gross responded to Mr. Patel by asserting that Factor King's assignment was pursuant to Section 9-406 of the Uniform Commercial Code (UCC) and was not subject to the contract provision.

---

[6] In the Master Service Agreement, it was agreed that neither party would "assign or subcontract all or any part of this Agreement."

7

On October 6, 2011, Mr. Patel met with Swift Energy's outside counsel to discuss Factor King's claims. On that same day, Mr. Patel also instructed Ms. Keo to search her emails, including her junk email filters, for any further emails received from Factor King.

After obtaining and reviewing a copy of the Factoring Agreement, Mr. Patel also reviewed copies of all of Plemco-South's June, July, and August 2011 invoices. In doing so, he noted that none of the invoices contained the notice set out in Section 11.3 of the Factoring Agreement. Mr. Patel further became aware that Swift Energy had issued three checks to Plemco-South between August 18, 2011, and September 29, 2011, in the amounts of $3,477.06; $87,865.64; and $3,229.50; and that no payments had been made to Plemco-South subsequent to September 29, 2011.

On October 27, 2011, Swift Energy filed the suit now before us against Plemco-South and Factor King. In its initial pleading, Swift Energy sought a declaratory judgment regarding its liability under the Factoring Agreement and effected a concursus proceeding by depositing in the registry of the court the remaining amounts it owed Plemco-South. In a subsequent pleading, Swift Energy sought a judgment against Plemco-South for unjust enrichment and breach of contract. Factor King answered Swift Energy's petition and asserted peremptory exceptions of no cause of action, no right of action, and failure to state a cause of action upon which relief can be granted. Additionally, Factor King filed a reconventional demand against Swift Energy, seeking a monetary judgment for the $87,865.64 paid by Swift Energy to Plemco-South.

After issue was joined, Swift Energy filed a motion for summary judgment, asserting it was not liable to Factor King because La.R.S. 10:9-406 applies only to

8

the assignment of accounts, and Factor King admitted that none of Swift Energy's accounts had been assigned to it by Plemco-South. Swift Energy argued, in the alternative, that should the trial court find that La.R.S. 10:9-406 did apply, then Factor King had failed to provide sufficient notice. Factor King responded with its own motion for summary judgment addressing the issue of Swift Energy's liability pursuant to the Factoring Agreement.

Following a July 15, 2014 hearing on the motions, the trial court issued oral reasons for judgment granting Swift Energy's motion for summary judgment and rejecting Factor King's motion for summary judgment. Specifically, the trial court stated the following:

> I think the answer to this is simple despite the volumes, the ream of paper that constitutes the file, and it is this. Revised Statute 10:9-406(a) is talking about an assignment. That means a transfer of interest. The facts before the Court include a fact that there was never a transfer of the Swift account to Factor King. It may have been included in its general agreement, the Factoring Agreement, but it remained only as - - the Swift Accounts remained only in the security interest category. And as such even if we consider that the notice to Keo on the 18th, and other notices on the 25th, would have been adequate had there been an assignment to alert Swift[,] there was no assignment at that time. Consequently this Revised Statute that I have cited is inoperative. So, the law is clear that the account debtor, Swift, is entitled to pay the original creditor until they have been notified that assignment was made. But since no assignment was made no notice, effective notice, could be achieved. And so, I am going to grant the Motion for Summary Judgment by Swift, and deny the motion for Summary Judgment by Factor King.

The trial court executed a written judgment corresponding to its oral reasons for judgment on July 30, 2014. In addition to dismissing all of Factor King's claims against Swift Energy, the trial court also recognized Factor King's claims against the funds made the subject of the concursus proceeding, but made those

9

claims subject to any and all orders arising from Plemco-South's federal bankruptcy proceeding, which was filed after Swift Energy filed its suit.[7]

Thereafter, Factor King perfected this appeal, wherein it asserted two assignments of error: (1) that the trial court erred as a matter of law in concluding that an account receivable must be sold by its owner to the lender in order to be assigned as collateral; and (2) in the alternative and assuming that the trial court concluded that accounts receivable do not have to be purchased to be assigned, it was legal error to conclude that the accounts at issue in this litigation were not assigned.

## OPINION

The appellate review of summary judgment is well settled. As noted in *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755, "[a]ppellate review of the granting of a motion for summary judgment is *de novo*, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate."

Additionally, although amended multiple times in the last three years,[8] summary judgment proceedings are still favored and are "designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969." La.Code Civ.P. art. 966(A)(2). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material

---

[7] On March 11, 2013, Plemco-South sought Chapter 7 relief under the Federal Bankruptcy Laws. *In re Plemco-South Inc., LLC*, Chapter 7 Bankruptcy Petition #13-20208, United States Bankruptcy Court, Western District of Louisiana (Lake Charles Division).

[8] The most significant changes in La.Code Civ.P. art. 966 relate to the requirements of proof and are codified in La.Code Civ.P. art. 966(F). However, the requirements of proof are not at issue in this litigation.

fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2).

With regard to the burden of proof, La.Code Civ.P. art. 966(C)(2) provides:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

In its oral reasons for judgment, the trial court referenced La.R.S. 10:9-406(a) and concluded that it was not applicable to the dispute because of Factor King's failure to give Swift Energy notice of the existence of the Factoring Agreement. Louisiana Revised Statutes 10:9-406(a) is a provision of Louisiana's version of the UCC, as codified in Chapter 9 of Title 10 of the Louisiana Revised Statutes and identified as the "Uniform Commercial Code—Secured Transactions" (hereinafter sometimes referred to as "UCC—LA"). La.R.S. 10:9-101.

Louisiana Revised Statutes 10:9-406(a) addresses the rights of third parties in secured transactions and provides:

> **Discharge of account debtor; effect of notification.** Subject to Subsections (b) through (i) and R.S. 10:9-411, an account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.[9]

---

[9] Subsections (b) through (i) of this Section and La.R.S. 10:9-411 are not applicable to the facts before us.

11

In its oral reasons for judgment, the trial court equated an assignor/assignee relationship to constitute an actual "transfer of interest" and concluded that because the Swift Energy accounts payable had not been transferred in ownership to Factor King and were nothing more than collateral security, La.R.S. 10:9-406(a) did not apply to the litigation. We find merit in Factor King's argument that this conclusion was error on the part of the trial court.

Louisiana Revised Statutes 10:9-102 provides the definitions of the various terms used in the UCC—LA, and these definitions clearly establish that accounts receivable may be sold or made the subject of a security interest. While neither the term "assignment" nor the term "transfer" are defined in La.R.S. 10:9-102, a number of comments follow the definitions, including Comment 26, which explains the difference between the use of these terms in the UCC—LA:

> In numerous provisions, this Article refers to the "assignment" or the "transfer" of property interests. These terms and their derivatives are not defined. This Article generally follows common usage by using the terms "assignment" and "assign" to refer to transfers of rights to payment, claims, and liens and other security interests. It generally uses the term "transfer" to refer to other transfers of interests in property. Except when used in connection with a letter-of-credit transaction (see Section 9-107, Comment 4), no significance should be placed on the use of one term or the other. Depending on the context, each term may refer to the assignment or transfer of an outright ownership interest or to the assignment or transfer of a limited interest, such as a security interest.

This language is repeated in Comment (c) of the 2001 Louisiana Official Revision Comments to La.R.S. 10:9-406, as revised in 2004.

Thus, the only issue remaining is whether Swift Energy received authenticated notification of the assignment to Factor King prior to paying to Plemco-South the funds at issue. In considering this issue, we note that the undisputed facts are that the Factoring Agreement was executed on July 27, 2011, and the payment to Plemco-South at issue occurred on September 2, 2011. We

12

also note that the undisputed facts establish that on August 18, 2011, Monica Gleberman emailed a document to Ms. Keo which contained information concerning the assignment effected by the Factoring Agreement and making demand on Ms. Keo to execute documents recognizing the assignment and agreeing to pay all sums owed by Swift Energy to Factor King; that on August 25, 2011, Mr. Stigall emailed Ms. Keo and requested that she execute the documents forwarded to her by Ms. Gleberman. These emails are the foundation for Factor King's argument that Swift Energy received the authenticated notification required by La.R.S. 10:9-406(a) and, therefore, did not discharge its obligation as account debtor of Plemco-South by paying Plemco-South and not Factor King.

However, it is also undisputed that on August 4, 2011, Ms. Keo received an email from Mr. Stigall to the effect that Plemco-South was changing its line of credit provider and needed information concerning its outstanding accounts receivable held by Swift Energy, but that he made no mention of the Factoring Agreement in that communication; in fact, he requested that payment of the outstanding invoices be expedited for payment to Plemco-South. Furthermore, the record before us undisputedly establishes that Ms. Keo did not examine the documents forwarded to her, but instructed both Ms. Gleberman and Mr. Stigall that she was not the individual responsible for making payment decisions. She then specifically instructed both Ms. Gleberman and Mr. Stigall concerning where the assignment information should be forwarded for consideration by those individuals having authority to act on the documents.

Concerning the procedure established by Swift Energy for the handling of payments to contract suppliers, there is also no factual dispute. The company maintains a large operation and chose at some time in the past to departmentalize

13

their financial relationships with its contract suppliers. Thus, Ms. Keo correctly directed both Ms. Gleberman and Mr. Stigall to the correct department for consideration of their requests. Both choose not to follow Ms. Keo's directions.

That failure on their part allowed Plemco-South, acting through Mr. Stigall, to obtain the $87,865.64 check at issue in this litigation. Factor King, nevertheless, argues that the burden was on Ms. Keo, not Ms. Gleberman or Mr. Stigall, to forward the documents to the correct department and that notice to her was notice to Swift Energy.

The fifth circuit in *Advocate Financial, L.L.C. v. Longenecker & Associates, Ltd.*, 08-490 (La.App. 5 Cir. 11/25/08), 3 So.3d 1, *writ denied*, 08-2993 (La. 2/18/09), 1 So.3d 462, addressed an issue similar to the one now before this court, but relating to the discharge of a tortfeasor pursuant to La.R.S. 10:9-412. In that opinion, the court stated the following:

> Though this statute contains no definition of notice, notice is defined in Louisiana's Commercial Laws, LSA-R.S. 10:1-201(25), (26), and (27),[10] as follows:
>
> (25) A person has "notice" of a fact when
>
>> (a) he has actual knowledge of it; or
>>
>> (b) he has received a notice or notification of it; or
>>
>> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge" of a fact when he has actual knowledge of it.
>
> (26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when
>
>> (a) it comes to his attention; or

---

[10] Effective August 1, 2006, La.R.S. 10:1-201(25), (26), and (27) were combined as the basis for La.R.S. 10:1-202 by 2006 La. Acts No. 533, § 1.

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

(27) Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction *from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines.* Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

*Id.* at 7-8 (emphasis added) (footnote omitted).

Based on the evidence presented in support of the motions for summary judgment, we find that the notice required by La.R.S. 10:9-406(a) was not effected prior to Swift Energy's payment to Plemco-South. Given the size of its operation, we find that Swift Energy maintained reasonable routines for communicating significant information through its departmentalization policy, and both Factor King and Plemco-South were timely made aware of the proper department for delivery of the required notice. Had either Ms. Gleberman or Mr. Stigall followed Ms. Keo's instruction, notice would have been effected to the appropriate department well before the payment to Plemco-South at issue.

Accordingly, we find no merit in Factor King's two assignments of error.

**DISPOSITION**

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of this appeal to Factor King, LLC.

**AFFIRMED.**

15