Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/11/2020 09:09 AM CST

First State Bank Nebraska, appellant,
v. MP Nexlevel, LLC, appellee.

___ N.W.2d ___

Filed September 18, 2020.    No. S-19-543.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. \_\_\_\_: \_\_\_\_. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

4. **Uniform Commercial Code: Secured Transactions: Security Interests.** Article 9 of the Uniform Commercial Code, as adopted by Nebraska, provides a comprehensive scheme for the regulation of security interests.

5. **Uniform Commercial Code: Secured Transactions.** Article 9 of the Uniform Commercial Code, in part, applies to both a sale of certain payment rights—accounts, chattel paper, intangibles, and promissory notes—and the grant of an interest in specified payment rights to secure an obligation.

6. **Uniform Commercial Code: Secured Transactions: Debtors and Creditors.** In the case of a debtor granting a party payment rights to secure an obligation, part 6 of article 9 of the Uniform Commercial Code provides enforcement rights of the secured party in the event of a default by the debtor, as well as certain limitations on the exercise of those rights for the protection of the defaulting debtors, other creditors, and other affected persons.

7. ____: ____: ____. Part 4 of article 9 of the Uniform Commercial Code primarily addresses the rights and duties of account debtors and other persons obligated on collateral who are not, themselves, parties to a secured transaction.

8. **Statutes: Appeal and Error.** In construing a statute, statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

9. **Statutes: Legislature: Intent.** Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.

10. **Uniform Commercial Code: Statutes.** While official comments to the Uniform Commercial Code, as adopted by Nebraska, are not binding, they are persuasive in matters of statutory interpretation.

11. **Uniform Commercial Code: Secured Transactions: Assignments: Words and Phrases.** Unless there is a good reason for the definition of "assignment" to apply more narrowly in a given context, "assignment" under article 9 of the Uniform Commercial Code includes both an outright transfer of ownership and a contingent transfer for security.

12. ____: ____: ____: ____. The determination of whether a sale or grant of an interest amounts to an "assignment" as used in a given statute under article 9 of the Uniform Commercial Code depends upon the context of the statute and the interest given.

13. **Uniform Commercial Code: Secured Transactions: Security Interests: Assignments: Words and Phrases.** "Assignment" and its derivatives under Neb. U.C.C. § 9-406(a) (Reissue 2001 & Cum. Supp. 2018) apply to presently exercisable security interests.

14. **Uniform Commercial Code: Secured Transactions: Notice.** Whether a notice is sufficient under Neb. U.C.C. § 9-406(a) (Reissue 2001 & Cum. Supp. 2018) depends upon the facts of each case.

15. **Uniform Commercial Code: Secured Transactions: Assignments: Notice.** In order to be sufficient under Neb. U.C.C. § 9-406(a) and (b)(1) (Reissue 2001 & Cum. Supp. 2018), a notice has to reasonably identify the rights assigned and demand payment to the assignee.

16. **Uniform Commercial Code: Secured Transactions: Notice.** A reasonable identification need not identify the right to payment with specificity, and "magic words" are not required for a notice under Neb. U.C.C. § 9-406(a) (Reissue 2001 & Cum. Supp. 2018) to be effective.

17. **Uniform Commercial Code: Secured Transactions: Debtors and Creditors.** Neb. U.C.C. § 9-406(a) (Reissue 2001 & Cum. Supp. 2018) can modify an account debtor's obligations under its agreement with

the debtor if certain criteria are met, and Neb. U.C.C. § 9-607(a)(3) (Reissue 2001 & Cum. Supp. 2018) permits the secured party to enforce the account debtor's obligations.

18. **Uniform Commercial Code: Secured Transactions.** Default under article 9 of the Uniform Commercial Code is not contingent on an adjudication or agreement.

19. ____: ____. Article 9 of the Uniform Commercial Code leaves to the agreement of the parties the circumstances giving rise to a default; default is whatever the security agreement says it is.

20. ____: ____. Under Neb. U.C.C. § 9-607(a)(3) (Reissue 2001 & Cum. Supp. 2018), it is unnecessary for a secured party to first become the owner of the collateral pursuant to a disposition or acceptance.

21. ____: ____. Under Neb. U.C.C. § 9-607(a)(3) (Reissue 2001 & Cum. Supp. 2018), a secured party may collect and enforce obligations included in collateral in its capacity as a secured party.

22. **Standing: Jurisdiction: Parties.** Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's or tribunal's exercising its jurisdiction and remedial powers on the party's behalf.

23. **Standing: Words and Phrases.** Standing involves a real interest in the cause of action, meaning some legal or equitable right, title, or interest in the subject matter of the controversy.

24. **Standing: Claims: Parties.** To have standing, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Reversed and remanded for further proceedings.

Brandon R. Tomjack and Nicholas A. Buda, of Baird Holm, L.L.P., for appellant.

Michael S. Degan, of Kutak Rock, L.L.P., for appellee.

Anthony Schutz for amicus curiae Commercial Law Amicus Initiative.

Robert J. Hallstrom and Gerald M. Stilmock, of Brandt, Horan, Hallstrom & Stilmock, for amicus curiae Nebraska Bankers Association, Inc.

Heavican, C.J., Cassel, Funke, Papik, and Freudenberg, JJ.

Funke, J.

First State Bank Nebraska (First State) challenges the district court's order dismissing its claims against MP Nexlevel, LLC. MP Nexlevel contracted to pay Husker Underground Utilities & Construction, LLC (Husker Underground), for certain construction services. First State held a security interest in Husker Underground's accounts due to separate loan agreements. When Husker Underground failed to meet its loan obligations, First State sought direct payment of MP Nexlevel's obligations under the contract by sending MP Nexlevel notices of Husker Underground's default. Despite the notices, MP Nexlevel continued to submit its payments to Husker Underground, and First State brought suit against MP Nexlevel for performance under the contract.

First State challenges the district court's finding that it lacked standing because it was not a party to the contract, Neb. U.C.C. § 9-607(a) (Reissue 2001 & Cum. Supp. 2018) did not authorize it to enforce MP Nexlevel's obligations under the contract, and Neb. U.C.C. § 9-406(a) (Reissue 2001 & Cum. Supp. 2018) did not apply, because First State held a security interest rather than an assignment of Husker Underground's rights to payment under the contract. For the reasons set forth herein, we reverse the judgment of the district court and remand this matter for further proceedings consistent with this opinion.

## BACKGROUND

First State is a domestic bank chartered by and registered in the State of Nebraska. MP Nexlevel is a Minnesota limited liability company performing excavation, trenching, and other services for Nebraska customers as well as customers in other states.

In January 2018, MP Nexlevel and Husker Underground entered into a subcontract agreement whereby Husker Underground promised to perform certain construction services.

As Husker Underground performed these services, it would submit invoices to MP Nexlevel for payment. MP Nexlevel was generally required to pay these amounts within 45 days of approval. Husker Underground performed these services throughout 2018. First State was not a party to the subcontract or any other agreement between MP Nexlevel and Husker Underground.

Between May and June 2016, First State loaned money to Husker Underground pursuant to various promissory notes and agreements. These agreements included a May promissory note executed in the original principal amount of $50,000, a June promissory note in the original principal amount of $635,500, and a May business manager agreement with business and professionals in which First State agreed, in part, to purchase certain accounts receivable from Husker Underground. Husker Underground secured these agreements by granting First State a security interest in virtually all of its assets, including its accounts and accounts receivable. First State filed three financing statements with the Nebraska Secretary of State to perfect these security interests. MP Nexlevel was not a party to any agreement between First State and Husker Underground and had no actual knowledge of the two parties' relationship.

Husker Underground failed to make payments to First State when due, including failing to pay the May note in full upon maturity. As such, in August 2018, First State filed a lawsuit against Husker Underground, alleging Husker Underground was in default under the agreements and seeking a judgment for the payment of the remaining obligations. On January 23, 2019, the district court entered a stipulated order, signed by Husker Underground representatives, granting summary judgment in favor of First State.

Prior to filing suit against Husker Underground, First State sent three notices to MP Nexlevel in May, July, and August 2018. These notices alleged that Husker Underground had defaulted on loans from First State, that Husker Underground had granted First State a security interest in its accounts, and that Husker Underground assigned First State its rights to

receive payments from MP Nexlevel as a result of its default. The notices directed MP Nexlevel to pay all amounts owed on Husker Underground's accounts to First State directly and warned that failure to do so could result in adverse consequences for MP Nexlevel. Attached was a copy of a Uniform Commercial Code (UCC) financing statement identifying the security interest in Husker Underground's accounts.

Once MP Nexlevel received the May 2018 notice, it contacted representatives at First State and Husker Underground. As to the communication with First State, affidavits offered by the parties alleged slightly varying facts as to MP Nexlevel's representations on whether it would comply with the notice's directions. Pat Carlson, an MP Nexlevel accounting supervisor, stated that he telephoned Miranda Hobelman, of First State,

> in order to gather additional information, including the amount [First State] claimed it was owed by Husker Underground. I informed [Hobelman] that [MP Nexlevel] would review and decide the matter after due consideration of [MP Nexlevel's] legal rights and responsibilities, if any, to [First State] and Husker Underground.

Hobelman, First State's general counsel and a senior vice president, stated:

> . . . I received a telephone call from . . . Carlson with MP Nex[l]evel who[] acknowledged receipt of [First State's] May Notice and otherwise stated that MP Nexlevel would be cooperating with the Notice and sending payments on the Accounts directly to [First State]. After our call, I sent . . . Carlson two emails . . . following-up our conversation confirming that [MP Nexlevel] would send [First State] all funds owed to Husker Underground on the Accounts.

The first email Hobelman referenced in her affidavit apologized for missing Carlson's initial call and stated, "Please make the checks payable to First State . . . as requested in the letter." The second email thanked Carlson for calling back, explaining, "As we discussed, please send funds owed to Husker Underground to First State . . . until the total of funds

sent equals $1,033,242.30. The funds will be credited to Husker Underground's loans at First State."

As to MP Nexlevel's communication with Husker Underground, Carlson asserted that Husker Underground disputed the claim that it assigned its rights to receive MP Nexlevel payments to First State. Husker Underground, instead, demanded MP Nexlevel continue to make the payments to it under terms of the subcontract agreement. Carlson claimed that Husker Underground never directed MP Nexlevel to make payments to First State, that MP Nexlevel was never provided an assignment of Husker Underground's rights to payment under the subcontract, that MP Nexlevel was not notified of a judgment in favor of First State against Husker Underground, and that MP Nexlevel was not provided copies of the notes or agreement between First State and Husker Underground. As such, MP Nexlevel continued making its payments directly to Husker Underground. MP Nexlevel's discovery responses show MP Nexlevel made payments totaling $412,302.59 to Husker Underground after receiving the May 2018 notice. There are no outstanding invoices of Husker Underground for MP Nexlevel to pay.

In August 2018, 6 days after bringing suit against Husker Underground, First State filed a complaint against MP Nexlevel and, thereafter, filed a motion for summary judgment. First State alleged that because Husker Underground was in default of the notes and agreement and First State had a security interest in Husker Underground's accounts receivable, it had a right to enforce this security interest and foreclose upon the same pursuant to §§ 9-406(a) and 9-607(a). First State further alleged that once First State sent its May 2018 notice to MP Nexlevel, MP Nexlevel could discharge its obligations under the subcontract only by paying the invoiced amounts directly to First State. First State claimed that because MP Nexlevel continued paying the invoiced amounts to Husker Underground, MP Nexlevel breached its obligations under the subcontract, and that First State is entitled to payment of the delinquent amounts.

MP Nexlevel resisted First State's motion and filed a cross-motion for summary judgment. MP Nexlevel argued First State lacked standing to enforce the subcontract agreement, because there was no contractual relationship between First State and MP Nexlevel. Although MP Nexlevel received the notices, MP Nexlevel argued it properly continued to pay Husker Underground, because Husker Underground contested First State's assertions and there was insufficient documentation that Husker Underground's rights to payment under the subcontract were assigned to First State.

The district court overruled First State's motion for summary judgment and granted MP Nexlevel's cross-motion, dismissing the case with prejudice. First, the court held that § 9-607 does not give rise to a claim by a secured creditor against an account debtor where the debtor is not in default and has not otherwise agreed. As such, because the record demonstrated that Husker Underground denied being in default at the time of First State's notices and First State did not obtain its judgment against Husker Underground until January 23, 2019, First State did not have a cognizable claim against MP Nexlevel under § 9-607 for MP Nexlevel's performance under the subcontract. Additionally, the court determined that § 9-406(a) required receipt of notification of assignment in order to obligate the account debtor to pay the assignee and that an assignment is not the same as a secured interest. Because First State failed to adduce any evidence establishing Husker Underground made an assignment to First State, First State did not have authority under § 9-406(a) to demand MP Nexlevel to make the subcontract payments directly to it. As such, the court found First State lacked standing to pursue its claims for breach of the subcontract.

## ASSIGNMENTS OF ERROR

First State assigns, restated, that the district court erred by (1) failing to find genuine issues of material fact existed, (2) finding Husker Underground was not in default at the time MP Nexlevel received the notices, (3) failing to find

MP Nexlevel's motion was deficient by not filing an annotated statement of disputed facts, (4) admitting Carlson's affidavit, (5) holding an "assignment" under § 9-406 does not include a "security interest," and (6) granting MP Nexlevel's motion for summary judgment.

## STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1]

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[2]

[3] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[3]

## ANALYSIS
### Evidence and Finding of Husker Underground's Default

As an initial matter, several of First State's assignments claim MP Nexlevel presented evidence that Husker Underground was not in default at the time of First State's notices. First State claims this evidence and the court's finding that default had not occurred contradicted First State's allegations and evidence of Husker Underground's earlier default. On this basis, First

---

[1] *JB & Assocs. v. Nebraska Cancer Coalition*, 303 Neb. 855, 932 N.W.2d 71 (2019).

[2] *Id*.

[3] *Id*.

State contends that it was reversible error for MP Nexlevel to fail to file an annotated statement of disputed facts. Further, First State contends that the court erred in admitting Carlson's affidavit, finding Husker Underground was not in default at the time of the notice, and finding there were no genuine issues of material fact.

First State misstates MP Nexlevel's allegations and the court's findings. Contrary to First State's contention, MP Nexlevel did not contest that Husker Underground was in default of its loan obligations at the time of the notices. Instead, MP Nexlevel explained that at the time of the notices, Husker Underground disputed First State's claim that it was in default. MP Nexlevel, and Carlson's affidavit, made no allegation that the default had not actually occurred.

Additionally, the court made no findings that Husker Underground was not in default at the time of the notices. To the contrary, the court specifically found that "Husker Underground defaulted on its obligations owed to [First State] under the Businessmanager[] Agreement and Notes by failing to make payments to [First State] when due and failing to pay the May Note in full upon maturity." The court's basis for granting MP Nexlevel's motion for summary judgment was that the default was disputed at the time of the notices and not on the basis that the default did not occur.

Accordingly, First State's assignments premised on this proposition are without merit, and we turn to First State's assignments regarding its authority to seek and enforce payment of Husker Underground's account against MP Nexlevel after Husker Underground failed in its loan obligations to First State.

## ARTICLE 9 OF UCC

Husker Underground's agreements with First State imposed various financial obligations which Husker Underground secured by granting First State a security interest in virtually all of its assets, including its accounts and accounts receivable. These accounts included an agreement between Husker

Underground and MP Nexlevel where Husker Underground would provide certain services in exchange for payment from MP Nexlevel. As discussed above, it is undisputed that Husker Underground failed to meet its obligations to First State. This case arises from First State's attempt to enforce the security agreement after Husker Underground's failure to meet its obligations and hinges on whether First State could demand MP Nexlevel comply with the terms of the security agreements when Husker Underground had disputed it was in default.

[4,5] Article 9 of the UCC, as adopted by Nebraska, provides a comprehensive scheme for the regulation of security interests.[4] Article 9, in part, applies to both a sale of certain payment rights—accounts, chattel paper, intangibles, and promissory notes—and the grant of an interest in specified payment rights to secure an obligation.[5] Under article 9, a "secured party" includes, among others, either a person in whose favor a security interest is created or provided for under a security agreement or a person to which payment rights have been sold; a "debtor" includes a person having an interest in the collateral other than a security interest or other lien and a seller of payment rights; and an "account debtor" is a person obligated on an account, chattel paper, or general intangible subject to the payment rights sold or granted.[6]

[6] In the case of a debtor granting a party payment rights to secure an obligation, part 6 of article 9 provides enforcement rights of the secured party in the event of a default by the debtor, as well as certain limitations on the exercise of those rights for the protection of the defaulting debtors, other creditors, and other affected persons.[7] Section 9-607(a) states, in relevant part:

---

[4] See Neb. U.C.C. § 9-101, comment 1 (Reissue 2001 & Cum. Supp. 2018).

[5] Neb. U.C.C. § 9-109 (Reissue 2001).

[6] Neb. U.C.C. § 9-102(3), (28), (73) (Reissue 2001 & Cum. Supp. 2018).

[7] See Neb. U.C.C. § 9-601, comment 2 (Reissue 2001 & Cum. Supp. 2018).

If so agreed, and in any event after default, a secured party:

(1) may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party; [and]

. . . .

(3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

Section 9-607 addresses a secured party's rights in relation to the debtor to collect a specified payment right. However, this section "does not determine whether an account debtor . . . owes a duty to a secured party."[8]

[7] Part 4 of article 9 primarily addresses the rights and duties of account debtors and other persons obligated on collateral who are not, themselves, parties to a secured transaction.[9] As part of these duties, § 9-406(a) provides:

. . . [A]n account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

---

[8] § 9-607(e).

[9] See Neb. U.C.C. § 9-401, comment 2 (Reissue 2001).

In other words, prior to receiving notice otherwise, account debtors may discharge their obligations by paying the "assignor." However, once an account debtor receives notification of a transfer authenticated from the "assignor" or the "assignee" and receives instruction to pay the "assignee," § 9-406(a) mandates that an account debtor must comply and may only discharge their account obligations by paying the "assignee."

### Assignment Under § 9-406(a)

The district court interpreted the use of "assignor" and "assignee" in § 9-406(a) to impose no duty upon an account debtor in those instances where there has been a granting of a security interest. We disagree.

[8-10] In construing a statute, statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[10] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[11] While official comments to the UCC, as adopted by Nebraska, are not binding, they are persuasive in matters of statutory interpretation.[12]

[11] Unless there is a good reason for the definition of "assignment" to apply more narrowly in a given context, "assignment" under article 9 includes both an outright transfer of ownership and a contingent transfer for security.[13] Comment

---

[10] *State v. Galvan*, 305 Neb. 513, 941 N.W.2d 183 (2020).

[11] *Id.*

[12] *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999), *disapproved on other grounds, Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). See, also, *Fjellin ex rel. Leonard Van Liew v. Penning*, 41 F. Supp. 3d 775 (D. Neb. 2014).

[13] See §§ 9-102, comment 26, and 9-109.

26 of § 9-102 explains that article 9 uses "assignment" in numerous provisions but that it and its derivatives are not defined by the UCC. Comment 26 of § 9-102 states that "[t]his article generally follows common usage by using the terms 'assignment' and 'assign' to refer to transfers of rights to payment, claims, and liens and other security interests" and that "[d]epending on the context, ['assignment'] may refer to the assignment or transfer of an outright ownership interest or to the assignment or transfer of a limited interest, such as a security interest." We find no convincing justification for limiting the use of "assignment" in the context of § 9-406(a) when there is a presently exercisable security interest.

Indeed, comment 5 of § 9-406 indicates that the drafters intended "assignment" to include contingent transfers for security. In discussing certain types of assignments, comment 5 identifies "assignment of an account (whether outright *or to secure an obligation*)" and "*assignments of rights to payment as security* and other assignments of rights to payment such as accounts and chattel paper."[14] Comment 5 additionally includes an example hypothetical involving a security interest which applies § 9-406.

Other sections of article 9 support a reading of "assignments" to include both outright transfers of ownership and contingent transfers for security. For instance, Neb. U.C.C. § 9-209 (Reissue 2001) imposes a duty on an account debtor to free up collateral when there is no longer any outstanding "secured obligation" or commitment to give value in the future. In establishing that a "secured party" has a duty upon demand from the "debtor" to release the account debtor from any further obligation to the secured party, § 9-209 identifies the account debtor as one that "has received notification of *an assignment to the secured party as assignee* under section 9-406(a)."[15] Section 9-209(c) specifies that this section does

---

[14] § 9-406, comment 5 (emphasis supplied).

[15] § 9-209(b) (emphasis supplied).

not apply to assignments from the sale of accounts, chattel paper, or payment intangibles. Accordingly, by the language of § 9-209, that section supports the conclusion that "assignment" under § 9-406 includes those transfers which provide interests in specified payment rights to secure obligations.

Utilizing the current language of article 9, the U.S. District Court for the District of Arizona analyzed Arizona's version of § 9-406(a).[16] The court noted holdings by previous courts that notification of a security interest in the amount due is the same as notification that the amount due has been assigned and concluded that under Arizona's statute, there is "'no meaningful difference between a security interest and an assignment.'"[17]

Similarly, Colorado's Arapahoe County District Court in *Garber v. TouchStar Software Corp*[18] found that the UCC makes "'no distinction between a party with a security interest in a debtor's accounts receivable and a party who is an assignee of a debtor's accounts receivable.'" Several additional courts have also analyzed security agreements as assignments under the current article 9 version.[19]

In applying previous versions of article 9, other jurisdictions have determined there is no meaningful difference between an "assignment" and a "security interest" under the UCC. The Eighth Circuit in *In re Apex Oil Co.*[20] held that "notice of a security interest constitutes notice of an assignment for purposes of security under Article 9," explaining that "[w]e see no meaningful difference between a security interest and an

---

[16] *ARA Inc. v. City of Glendale*, 360 F. Supp. 3d 957 (D. Ariz. 2019).

[17] *Id*. at 967.

[18] *Garber v. TouchStar Software Corp*, No. 2009 CV1189, 2011 WL 12526062 at *4 (Colo. Dist. Nov. 10, 2011).

[19] See, *Lake City Bank v. R.T. Milord Co.*, No. 18 C 7159, 2019 WL 1897068 (N.D. Ill. Apr. 29, 2019); *Magnolia Financial Group v. Antos*, 310 F. Supp. 3d 764 (E.D. La. 2018); *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat.*, 27 F. Supp. 3d 494 (S.D.N.Y. 2014); *Swift Energy Operating v. Plemco-South*, 157 So. 3d 1154 (La. App. 2015).

[20] *In re Apex Oil Co.*, 975 F.2d 1365, 1369, 1370 (8th Cir. 1992).

assignment for purposes of security[ and i]n fact, they appear to be the same thing under Article 9." Similarly, the Supreme Court of Maine held that "[e]ven though Article 9 usually refers to a creditor with a security interest as a 'secured party,' a secured party with a security interest in accounts is the 'assignee' under [Maine's secured transactions statute]."[21] The U.S. Bankruptcy Court for the Eastern District of Tennessee also held that "'assignee' under [the Tennessee UCC] includes a secured party with a security interest in accounts or general intangibles."[22]

MP Nexlevel cites *IIG Capital LLC v. Archipelago, L.L.C.*[23] for the proposition that the use of the assignment derivatives in § 9-406 apply only to transfers of ownership and not contingent transfers for security. Specifically, MP Nexlevel quotes:

> Plaintiff also argues that a secured party with a security interest is the equivalent of an assignee for purposes of UCC 9-406. However, the cases plaintiff cites for this proposition do not support it. The cited cases deal with a distinct section of the UCC (former UCC 9-318 [1]), which provided that unless otherwise agreed, the rights of an assignee are subject to the terms of the original contract between the account debtor and assignor, including any defenses authorized therein . . . . While these cases treat assignees and holders of security interests similarly for purposes of holding them subject to defenses available to the original account debtors, they provide no authority to treat plaintiff's security interest as an assignment for collection purposes under UCC 9-406.[24]

---

[21] *Maine Farmers Exch. v. Farm Credit of Maine*, 789 A.2d 85, 88 n.7 (Me. 2002).

[22] *In re Otha C. Jean & Associates, Inc.*, 152 B.R. 219, 223 (E.D. Tenn. 1993).

[23] *IIG Capital LLC v. Archipelago, L.L.C.*, 36 A.D.3d 401, 829 N.Y.S.2d 10 (2007).

[24] *Id*. at 404, 829 N.Y.S.2d at 3.

In *IIG Capital LLC*, the secured party's interest was contingent upon an event of default but none was alleged.[25] The court dismissed the secured party's claim, stating that "plaintiff's right to collect on the collateral is expressly conditioned on an event of default, and no such default is alleged in the complaint."[26] Its statement evaluating whether a security interest was an assignment was dicta.

[12] Also, the security interest in *IIG Capital LLC* is distinguishable from the one in our review. Contrary to the security interest held by First State, the security interest in *IIG Capital LLC* was not alleged to be presently exercisable at the time of the notice, because it was contingent on the occurrence of an event that had not been alleged.[27] As stated above, the determination of whether a sale or grant of an interest amounts to an assignment as used in a given statute depends upon the context of the statute and the interest given.[28] Here, First State's security interest was presently exercisable due to Husker Underground's breach. Such context is distinct from a presently nonexercisable security interest which is contingent on the occurrence of a given event and which contingent event is not alleged to have occurred.

[13] In consideration of all of the above, we hold that "assignment" and its derivatives under § 9-406(a) apply to presently exercisable security interests.

SUFFICIENCY OF § 9-406(a) NOTICE

We next address whether First State's notification and authentication was sufficient to impose the § 9-406(a) duty upon MP Nexlevel to discharge its obligations on its Husker Underground agreement by paying First State.

---

[25] See *id.*

[26] *Id.*

[27] See *id.*

[28] See § 9-102, comment 26.

[14-16] Whether a notice is sufficient depends upon the facts of each case.[29] In order to be sufficient, the notice has to reasonably identify the rights assigned and demand payment to the assignee.[30] A reasonable identification need not identify the right to payment with specificity, and "magic words" are not required for a notice to be effective.[31]

Here, First State provided sufficient notice of its currently exercisable security interest in Husker Underground's account with MP Nexlevel. In its notices, First State identified itself, disclosed its agreements with Husker Underground which showed that Husker Underground had granted it a security interest in its accounts, and alleged Husker Underground had breached its loan obligations under those agreements. The notices directed MP Nexlevel to pay all amounts owed on Husker Underground's accounts directly to First State and warned that failure to do so could result in adverse consequences for MP Nexlevel. First State authenticated the security interest by attaching a copy of a UCC financing statement identifying the security interest.

The allegation that Husker Underground contested its breach at the time of First State's notices does not change the facts that Husker Underground had breached its obligations to First State, that First State notified MP Nexlevel of Husker Underground's breach and of its security interest, that First State provided documentation of that security interest, and that First State directed MP Nexlevel to pay all amounts owed on Husker Underground's accounts to First State, directly warning that failure to do so could result in adverse consequences for MP Nexlevel.

If MP Nexlevel was uncertain whether the breach occurred due to Husker Underground's representations, § 9-406(c) provides a means for MP Nexlevel to obtain additional proof

---

[29] See *ARA Inc., supra* note 16.

[30] § 9-406(a) and (b)(1).

[31] See § 9-406, comment 3. See, also, *ARA Inc., supra* note 16.

of First State's present authority to collect on the collateral. Section 9-406(c) states: "[I]f requested by the account debtor, an assignee shall seasonally furnish reasonable proof that the assignment has been made," and "[u]nless the assignee complies, the account debtor may discharge its obligation by paying the assignor, even if the account debtor has received a notification under [§ 9-406(a)]." As discussed above, an "assignment" and its derivatives under § 9-406 include presently exercisable security interests. Accordingly, if MP Nexlevel had reason to doubt that First State held a presently exercisable security interest to MP Nexlevel's accounts with Husker Underground, § 9-406(c) allows MP Nexlevel to request additional "reasonable proof" of such assignment, which First State would be required to "seasonally furnish."

We find First State's notices were sufficient to reasonably identify that First State had a presently exercisable security interest on Husker Underground's account with MP Nexlevel, provide authentication of that security interest, and demand MP Nexlevel perform its obligations on its agreement with Husker Underground by paying First State. As such, § 9-406(a) required that MP Nexlevel could discharge its obligations only by paying First State and not by paying Husker Underground. This is contrary to MP Nexlevel's assertion that it was entitled to the defense of discharge in that it fully performed and paid Husker Underground the obligated money because, as described in § 9-406(a), after receiving the notice, MP Nexlevel could discharge its obligation only by paying First State. Because MP Nexlevel continued paying Husker Underground and failed to pay First State, it breached its contractual obligations.

## DEFAULT UNDER § 9-607(a)

In order to exercise its authority under § 9-607(a)(3) to enforce MP Nexlevel's obligations, § 9-607(a) conditions this authority by stating that "[i]f so agreed, and in any event after default." The district court seemingly interpreted this language as requiring that should a default be contested, the

default occurs when it is adjudicated or the parties agree. The district court based its holding on § 9-607(e)'s statement that "[t]his section does not determine whether an account debtor . . . owes a duty to a secured party" and its finding that requiring an account debtor to determine whether a breach actually occurred imposes an additional duty upon the account debtor to the secured party.[32]

[17] As acknowledged above, § 9-607 does not impose a duty upon an account debtor. However, § 9-406(a) modifies an account debtor's obligations under its agreement with the debtor if certain criteria are met and § 9-607(a)(3) permits the secured party to enforce the account debtor's obligations.[33] A secured party's exercise of its § 9-607(a)(3) authority against the account debtor is not the imposition of a duty upon the account debtor but the enforcement of existing duties.

[18,19] Additionally, § 9-607(a) limits its application only to "after default" and default is not contingent on an adjudication or agreement. Article 9 leaves to the agreement of the parties the circumstances giving rise to a default; default is whatever the security agreement says it is.[34]

Here, the agreements between Husker Underground and First State all provide that default includes failure to make payments to First State when due. It is presently uncontested that Husker Underground had failed to make these payments when First State sent MP Nexlevel the notices. Although Husker Underground initially disputed its default and the matter had to be adjudicated, the date of default does not

---

[32] See *ImagePoint, Inc., supra* note 19.

[33] See, e.g., *Agri-Best Holdings v. Atlanta Cattle Exchange*, 812 F. Supp. 2d 898 (N.D. Ill. 2011); *Reading Co-Op. Bank v. Suffolk Const. Co.*, 464 Mass. 543, 984 N.E.2d 776 (2013); *Greenfield Commercial Credit, L.L.C. v. Catlettsburg Refining, L.L.C.*, No. Civ. A. 03-3391, 2007 WL 97068 (E.D. La. Jan. 9, 2007); *Garber, supra* note 18.

[34] See § 9-607, comment 3. See, also, *First Nat. Bank of Black Hills v. Beug*, 400 N.W.2d 893 (S.D. 1987).

change simply because Husker Underground had previously challenged it.

If MP Nexlevel did not have sufficient information to determine whether the default occurred and First State was presently authorized to collect on the collateral, it could have requested additional proof from First State pursuant to § 9-406(c) as discussed above. And, if First State did not comply, § 9-406(a) would not have imposed an additional duty, MP Nexlevel would be able to continue discharging its obligations by paying Husker Underground, and § 9-607(a) would not grant First State the authority to bring an action to enforce an obligation to pay it directly. Because MP Nexlevel did not request such additional proof and the notice under § 9-406(a) was sufficient, MP Nexlevel had a duty under § 9-406(a) to pay First State directly to discharge its contractual obligations and § 9-607(a)(3) provided First State the authority to step into Husker Underground's place and enforce MP Nexlevel's obligations as adjusted by operation of § 9-406(a).

We conclude that the district court erred in its requirement that should a debtor contest that a default occurred at the time of the § 9-406(a) notice, the default under § 9-607(a) to allow the secured party to enforce an account debtor's obligation to pay it directly does not occur until the default is adjudicated or the parties otherwise agree. Instead, the default occurs when determined by the security agreement—in this case, when Husker Underground failed to make timely payments. If the debtor contests the default, the account debtor is authorized to exercise its authority under § 9-406(e) to acquire more proof of the secured party's presently exercisable security interest. If the account debtor does not seek additional proof or if the secured party provides adequate proof, § 9-406(a) imposes a duty upon the account debtor to discharge its obligations by paying the secured party and the secured party can enforce those obligations under § 9-607(a)(3). The date of default relevant to § 9-607(a) remains as determined by the security agreement.

### Standing

[20,21] For completeness, MP Nexlevel claims that First State lacked standing to bring this action, because First State was not in privity of contract and §§ 9-406 and 9-607 do not provide private rights of action. However, First State did not bring claims for violations of §§ 9-406 and 9-607, but instead brought claims for breach of contract and account stated. First State's reliance on §§ 9-406 and 9-607 was merely for the purpose of placing itself in the position to enforce Husker Underground's agreement with MP Nexlevel as adjusted by operation of § 9-406(a) so as to require payment be sent to First State. Under § 9-607(a)(3), it is unnecessary for a secured party to first become the owner of the collateral pursuant to a disposition or acceptance.[35] A secured party may collect and enforce obligations included in collateral in its capacity as a secured party.[36]

[22-24] Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's or tribunal's exercising its jurisdiction and remedial powers on the party's behalf.[37] Standing involves a real interest in the cause of action, meaning some legal or equitable right, title, or interest in the subject matter of the controversy.[38] To have standing, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of third parties.[39]

First State was authorized by its security agreements with Husker Underground and § 9-607(a)(3) to step into Husker Underground's place to enforce MP Nexlevel's contractual obligations. Further, § 9-406(a) imposes a duty upon MP

---

[35] See § 9-607, comment 6.

[36] See *id.* See, also, *Agri-Best Holdings, supra* note 33.

[37] *Applied Underwriters v. S.E.B. Servs. of New York*, 297 Neb. 246, 898 N.W.2d 366 (2017).

[38] *Id.*

[39] *Id.*

Nexlevel to discharge its obligation by paying First State and prevents MP Nexlevel from claiming it satisfied its contractual obligations by paying Husker Underground. As a result, First State had standing to bring its claims against MP Nexlevel.

## CONCLUSION

The district court erred in granting MP Nexlevel summary judgment and dismissing First State's complaint. First State was authorized by § 9-607(a)(1) to notify Husker Underground, as the account debtor obligated under the collateral, to make payment for its benefit due to Husker Underground's default. Section 9-406(a) applies to presently exercisable security interests, and because First State's notice and authentication were sufficient, § 9-406(a) imposed a duty on MP Nexlevel to discharge its obligations under its agreement with Husker Underground by paying directly to First State. When MP Nexlevel continued paying to Husker Underground and failed to pay directly to First State, MP Nexlevel breached its obligations and First State was authorized by § 9-607(a)(3) to step into Husker Underground's place and enforce MP Nexlevel's contractual obligations as adjusted by operation of § 9-406(a). After having received notice of First State's claim, MP Nexlevel could have protected itself from liability by the very simple expedient of either demanding further proof (if it doubted the truth of First State's claims) or making the payments jointly to Husker Underground and First State. Because MP Nexlevel failed to do so, we must reverse the district court's order granting summary judgment in favor of MP Nexlevel and dismissing First State's complaint. We remand this matter to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

MILLER-LERMAN and STACY, JJ., not participating.