## Reading Co-Operative Bank *vs.* Suffolk Construction Company, Inc.

Suffolk. November 6, 2012. - March 13, 2013.

Present: Ireland, C.J., Spina, Botsford, Gants, Duffly, & Lenk, JJ.

*Uniform Commercial Code,* Secured creditor, Damages. *Damages,* Mitigation. *Estoppel.*

In a civil action brought by a bank, alleging breach of contract and violation of the Uniform Commercial Code (UCC), G. L. c. 106, § 9-405, arising from the misdirected payments by a contractor directly to a subcontractor after the subcontractor had assigned its right to receive payment under the subcontract to the bank, the judge properly entered judgment on the bank's UCC claim in the amount of the total value of the wrongfully misdirected payments, rather than the bank's actual damages, where the UCC displaces the common law on the question of the proper measure of a secured creditor's recovery under § 9-405 [547-554]; further, the judge properly declined to apply the common-law doctrine of mitigation to the same claim [554-555].

In a civil action brought by a bank, alleging breach of contract and violation of the Uniform Commercial Code, G. L. c. 106, § 9-405, arising from the misdirected payments by a contractor directly to a subcontractor after the subcontractor had assigned its right to receive payment under the subcontract to the bank, the judge erred in denying the bank's motion for partial judgment notwithstanding the verdict regarding two payments that the contractor made to the subcontractor, where, even assuming that the bank's silence after learning that the contractor had been paying the subcontractor directly constituted consent to that method of payment, there was no evidence that the contractor made the payments in question in reliance on the bank's silence. [555-557]

Civil action commenced in the Superior Court Department on May 25, 2006.

The case was tried before *Stephen E. Neel,* J., and entry of judgment was ordered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*R. Robert Popeo* (*Paul J. Ricotta* with him) for the defendant.

*Nelson G. Apjohn* (*Cynthia M. Guizzetti* with him) for the plaintiff.

LENK, J. This case requires us to determine, among other things, whether art. 9 of the Uniform Commercial Code displaces the common law on the question of the proper measure of a secured creditor's recovery under G. L. c. 106, § 9-405. We conclude that it does.

The defendant, Suffolk Construction Company, Inc. (Suffolk), contracted with Benchmark Mechanical Systems (subcontractor) for construction of elements of a heating, ventilation, and air conditioning (HVAC) system at a building project in Reading. As partial collateral for a revolving line of credit, the subcontractor assigned to the plaintiff, Reading Co-Operative Bank (bank), its right to receive payment under the contract with Suffolk. Suffolk received notification of the assignment and agreed to make payments directly to the bank. However, Suffolk instead made twelve payments to the subcontractor. The subcontractor subsequently ceased business operations, with an outstanding debt to the bank on its line of credit.

Seeking recovery of the total value of the misdirected payments, the bank filed an action in the Superior Court for breach of contract and violation of the Uniform Commercial Code (UCC), pursuant to G. L. c. 106, § 9-405. A Superior Court jury found Suffolk liable on both counts for ten of the twelve checks that Suffolk had delivered to the subcontractor. The jury found that the bank was estopped from recovering with respect to the final two checks. The jury calculated the bank's actual damages as $533,348.62, and the judge entered judgment on the contract claim in this amount. However, concluding that he was statutorily required to do so, the judge entered judgment on the statutory claim in the amount of $3,015,000.49, the full face value of the ten checks for which the jury found liability. Both parties appealed, and we transferred the case to this court on our own motion.

We conclude that the judge properly entered judgment on the bank's statutory claim in the amount of the wrongfully misdirected payments, and that he properly declined to apply the common-law doctrine of mitigation of damages to the same claim. However, we conclude that it was error to deny the bank's motion for partial judgment notwithstanding the verdict with

respect to the final two checks, as there was insufficient evidence before the jury to support Suffolk's defense of estoppel.[1]

1. *Background.* a. *Facts.* We recite the facts the jury could have found, reserving certain facts for discussion in connection with the specific issues raised.

In December, 2000, the subcontractor opened checking and savings accounts with the bank, as well as a revolving line of credit secured by its accounts receivable and business assets. The bank later increased the amount the subcontractor could borrow under the line of credit to $1.5 million. In May, 2004, Suffolk entered into a contract with the subcontractor for construction of elements of an HVAC system at a furniture store to be built in Reading (HVAC subcontract). As security for its line of credit, the subcontractor assigned its accounts receivable under the HVAC subcontract to the bank, authorizing Suffolk to make payments due under the HVAC subcontract directly to the bank. Suffolk signed an acknowledgment and assent to assignment (acknowledgment agreement), by which it agreed to make payments directly to the bank. In the terminology of the UCC, the subcontractor thus became the "assignor," the bank became the "assignee," and Suffolk became the "account debtor." See G. L. c. 106, § 9-405 (*a*). The line of credit

---

[1]Suffolk Construction Company, Inc. (Suffolk), additionally alleges that the judge erred in awarding prejudgment interest on the recovery by Reading Co-Operative Bank (bank) under G. L. c. 106, § 9-405. We decline to consider this argument, as we conclude that it was not properly preserved for appeal. The bank first requested the award of prejudgment interest in a joint status report filed by the parties on May 15, 2009. Suffolk did not object to the request. On June 11, 2009, the parties filed posttrial memoranda, and the bank again requested the award of prejudgment interest. Suffolk objected to the bank's request in a single footnote in its memorandum. On June 12, 2010, the judge issued an order for entry of judgment, granting the bank's request for prejudgment interest. Although the judge's accompanying memorandum of decision did not discuss the issue of prejudgment interest, Suffolk did not request reconsideration of the issue. In light of the foregoing, Suffolk's objection was not adequately preserved, and we accordingly decline to consider it. See *Ten Local Citizen Group* v. *New England Wind, LLC*, 457 Mass. 222, 232 n.15 (2010) (declining to consider argument where plaintiffs raised it only in their complaint and then in footnote in reply memorandum, and where plaintiffs did not ask judge to reconsider issue when his decision did not address it); *Milton* v. *Civil Serv. Comm'n*, 365 Mass. 368, 379 (1974) (argument cannot be raised for first time before this court).

was also secured by a personal guaranty from W. Douglas Fox, one of the subcontractor's owners (Fox guaranty).

Although Suffolk agreed to make payments directly to the bank, those at Suffolk with responsibility for such payments were not aware of this arrangement. As a result, between June 14 and December 30, 2004, Suffolk issued twelve checks totaling $3,822,500.49 to the subcontractor instead of to the bank. The checks were deposited into the subcontractor's savings account with the bank.

The subcontractor ceased business operations in 2005, with an outstanding debt of $1,499,149.42 on its line of credit. In 2006, the bank brought suit against Suffolk for recovery of the total value of the twelve payments mistakenly issued to the subcontractor, alleging breach of contract and violation of G. L. c. 106, § 9-405.[2] In other collection efforts, the bank recovered $430,402.38, which it applied against the subcontractor's debt.

In May, 2007, the bank and Fox entered into a forbearance agreement restructuring the Fox guaranty. Fox agreed to convert certain real estate into cash collateral, and the bank agreed not to apply the collateral to any debt guaranteed by Fox until the earlier of the date on which its litigation against Suffolk was complete or May 11, 2009.

b. *Prior proceedings.* In April, 2009, a Superior Court jury found that, as to all twelve payments made to the subcontractor, Suffolk had both committed a breach of the acknowledgment agreement and violated art. 9 of the UCC.[3] However, the jury found that the bank was estopped from recovering as to the last two payments. On that issue, the bank filed a motion for partial judgment notwithstanding the verdict, which was denied. On

---

[2]The bank's two claims against Suffolk are based on different operative documents. Its breach of contract claim is based on the acknowledgment agreement, by which Suffolk agreed to pay the bank directly. Its Uniform Commercial Code (UCC) claim is based on the subcontract between Suffolk and Benchmark Mechanical Systems (subcontractor). Upon receipt of notification of the assignment, Suffolk (the account debtor) was obligated under the UCC to make payments under the subcontract to the bank (the assignee), regardless of whether it agreed to do so. See G. L. c. 106, § 9-405 (*a*). The acknowledgment agreement is material to the bank's UCC claim only as it evidences the requisite notification of assignment.

[3]Article 9 of the UCC addresses the law of secured transactions. See G. L. c. 106, § 9-101.

May 26, 2009, the bank and Fox entered into a modification agreement that allowed the bank to hold the Fox guaranty to secure another loan guaranteed by Fox.

On June 12, 2010, the judge issued an order for entry of judgment. As to the breach of contract claim, the judge entered judgment in the amount of $533,348.62, which represented the jury's determination of the bank's actual damages.[4] As to the UCC claim, the judge entered judgment in the amount of $3,015,000.49, which represented the total value of the ten payments the jury found had been wrongfully misdirected.[5] The judge also determined that, although the bank had an "unfettered right" to apply the Fox guaranty to the subcontractor's debt as of May 11, 2009, Suffolk was not entitled to an offset in the amount of the guaranty. Both parties appealed.

2. *Discussion.* a. *Measure of recovery.* Suffolk argues that the proper measure of recovery under G. L. c. 106, § 9-405, is the bank's actual damages, rather than the total value of the wrongfully misdirected payments. "The measure of damages is a question of law reviewed de novo on appeal." *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 424 (2005).

We interpret a statute in accordance with the plain meaning of its text. *Massachusetts Community College Council MTA/NEA* v. *Labor Relations Comm'n*, 402 Mass. 352, 354 (1988). "[S]tatutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). "[T]he primary source of insight into the intent of the Legislature is the language of the statute." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 853 (1983). If the language of the statute is unambiguous, our function is to enforce

---

[4]The jury's determination of the bank's actual damages reflects testimony as to which of the payments the bank would have retained and which it would have paid over to the subcontractor had the payments been properly directed, as well as testimony as to the sum that the bank recovered through other collection efforts.

[5]Although judgment entered on both the contract claim and the UCC claim, the bank recognizes that it may not recover on both counts. As stated in its brief, "Upon affirmance of the UCC judgment, [the bank] will not seek to recover the contract damages awarded in the trial court."

the statute according to its terms. *Massachusetts Community College Council MTA/NEA* v. *Labor Relations Comm'n, supra.* To guide our interpretation of a particular section of a statute, we consider the statute as a whole. *Wolfe* v. *Gormally,* 440 Mass. 699, 704 (2004). Therefore, in assessing the proper measure of damages under G. L. c. 106, § 9-405, we look to the text of that section, as well as to the text of the UCC as a whole, to determine the intent of the Legislature.[6]

[6]General Laws c. 106, § 9-405 (*a*), states in relevant part:

"[A]n account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor."

Also central to our analysis are G. L. c. 106, §§ 9-607 and 9-608. General Laws c. 106, § 9-607, states in relevant part:

"(*a*) Collection and enforcement generally. If so agreed, and in any event after default, a secured party:

"(1) may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party . . .

"(3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral . . . ."

General Laws c. 106, § 9-608, states in relevant part:

"(*a*) Application of proceeds, surplus, and deficiency if obligation secured. If a security interest or agricultural lien secures payment or performance of an obligation, the following rules apply:

"(1) A secured party shall apply or pay over for application the cash proceeds of collection or enforcement under Section 9-607 in the following order to:

"(A) the reasonable expenses of collection and enforcement and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party;

Suffolk asserts that, following common-law principles, the bank's recovery under G. L. c. 106, § 9-405, should be limited to its actual damages. Common-law principles supplement the UCC "[u]nless displaced by the particular provisions of this chapter." G. L. c. 106, § 1-103. "[A] statute is not to be interpreted as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed." *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 438 (1980), quoting *Pineo* v. *White*, 320 Mass. 487, 491 (1946). Such intent need not be explicitly stated in the statute. It may be inferred "[w]here a UCC provision specifically defines parties' rights and remedies." *Gossels* v. *Fleet Nat'l Bank*, 453 Mass. 366, 370 (2009). Similarly, it may be inferred where the UCC provides a comprehensive scheme for enforcement of rights and allocation of losses that would be effectively undermined by application of conflicting common-law principles. See *Bank of Am., N.A.* v. *Prestige Imports, Inc.*, 75 Mass. App. Ct. 741, 764 (2009).

Article 9 contains a comprehensive scheme for enforcement of rights and allocation of losses. Once an account debtor (here, Suffolk) receives notification of an assignment, it may discharge its contractual obligation to the assignor (here, the subcontractor) only by paying the assignee (here, the bank).

"(B) the satisfaction of obligations secured by the security interest or agricultural lien under which the collection or enforcement is made; and

"(C) the satisfaction of obligations secured by any subordinate security interest in or other lien on the collateral subject to the security interest or agricultural lien under which the collection or enforcement is made if the secured party receives an authenticated demand for proceeds before distribution of the proceeds is completed . . .

"(4) A secured party shall account to and pay a debtor for any surplus, and the obligor is liable for any deficiency."

Finally, G. L. c. 106, § 1-106, part of the UCC's general provisions, states:

"(1) The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this chapter or by other rule of law.

"(2) Any right or obligation declared by this chapter is enforceable by action unless the provision declaring it specifies a different and limited effect."

G. L. c. 106, § 9-405 (*a*). See *District of Columbia* v. *Thomas Funding Corp.*, 593 A.2d 1030, 1034 (D.C. 1991).[7] Therefore, upon receipt of notification of assignment, the account debtor becomes statutorily obligated to pay the assignee in order to discharge its contractual obligation to the assignor. Upon the assignor's default, the assignee "may notify an account debtor . . . to make payment or otherwise render performance to or for the benefit of the secured party" and "may enforce the obligations of an account debtor . . . and exercise the rights of the [assignor] with respect to the obligation of the account debtor." G. L. c. 106, § 9-607 (*a*) (1), (3). Thus, where an account debtor receives notification of assignment but nonetheless pays only the assignor, the account debtor remains obligated in full under the contract, and upon the assignor's default, the assignee may enforce the account debtor's contractual obligations. See *First Bank* v. *Roslovic & Partners, Inc.*, 86 Ohio St. 3d 116, 119 (1999). See also comment 2 to UCC § 9-601, 3 U.L.A. 646 (Master ed. 2010) ("The rights of a secured party to enforce its security interest in collateral after the debtor's default are an important feature of a secured transaction"); G. L. c. 106, § 1-106 (2) ("Any right or obligation declared by this chapter is enforceable by action").

Further, art. 9 provides a detailed framework for the distribution of funds recovered by an assignee from an account debtor. See G. L. c. 106, § 9-608. It directs, first, that reasonable expenses of collection and enforcement be deducted from the funds; second, that the obligations of the assignor secured by the security interest under which the collection is made be satisfied from the funds; and third, that any obligations secured by subordinate security interests on the same collateral be satisfied from the funds. G. L. c. 106, § 9-608 (*a*) (1). Finally, it directs the assignee to pay any remaining surplus over to the assignor. G. L. c. 106, § 9-608 (*a*) (4). The statute's explicit anticipation of a possible surplus in recovery beyond the sum the assignee is ultimately entitled to retain is itself indication that the Legislature did not intend to limit recovery under G. L. c. 106, § 9-405, to the assignee's actual loss. See J.J. White & R.S.

---

[7]We note that authority from other jurisdictions is especially relevant in the context of the UCC, which seeks to "make uniform the law among the various jurisdictions." G. L. c. 106, § 1-102 (2) (*c*).

Summers, Uniform Commercial Code § 34-5, at 418 (6th ed. 2010) ("Such direct payment by the account debtor may be sufficient to retire the debtor's obligation to the secured party. Indeed, it may be more than sufficient in which event [G. L. c. 106, § 9-608 (*a*) (4),] requires the secured party to pay any surplus received from the account debtor over to the debtor").

Taken together, G. L. c. 106, §§ 9-405, 9-607, and 9-608, provide a comprehensive scheme designed to put "the aggrieved party . . . in as good a position as if the other party had fully performed." G. L. c. 106, § 1-106 (1). Upon an assignor's default, the assignee may enforce the outstanding contractual obligations of the account debtor. G. L. c. 106, § 9-607 (*a*). However, the assignee is entitled to retain only such funds as are necessary to recover reasonable costs of collection and enforcement and to satisfy the obligations of the assignor for which collection was secured. G. L. c. 106, § 9-608 (*a*).

The statutory framework accords as well with the stated purposes of the UCC, which are, among others, to "simplify, clarify and modernize the law governing commercial transactions." G. L. c. 106, § 1-102 (2) (*a*). Setting an assignee's recovery at the total value of all wrongfully misdirected payments offers greater clarity and certainty to lenders, whose recovery upon default would otherwise be subject to a jury's determination of actual loss, which may be unpredictable. See *First Bank* v. *Roslovic & Partners, Inc., supra* at 120 (Stratton, J., concurring) ("strict construction . . . preserves the goals of commercial stability and reliability" because "[l]enders will not lend in such an uncertain climate that depends on litigation for resolution").

Although there is more explicit language elsewhere in the UCC when displacing the common-law measure of damages, see G. L. c. 106, §§ 4-103 (*e*) and 9-625 (*f*), we do not require such language in order to displace the common law. Our task in construing a statute is to determine the intent of the Legislature. See *Boston Police Patrolmen's Ass'n* v. *Boston*, 435 Mass. 718, 719-720 (2002). Legislative intent to displace the common-law measure of damages may be inferred from explicit language mandating an alternate measure of damages, or from the establishment of a comprehensive framework that would be undermined

by application of common-law principles. See *Bank of Am., N.A.* v. *Prestige Imports, Inc., supra.*

Here, the UCC provides a coherent and comprehensive scheme under which an account debtor remains fully obligated on a contract when it wrongfully misdirects payments. See G. L. c. 106, § 9-405 (*a*). Application of the common-law measure of damages advanced by Suffolk would undermine this scheme by effectively forgiving a portion of an account debtor's outstanding contractual obligation whenever such obligation exceeds the assignee's actual damages. Further, the UCC makes specific provision for disbursement of recovered funds in excess of the secured creditor's actual damages. See G. L. c. 106, § 9-608 (*a*). Adoption of Suffolk's position would impermissibly render such provisions inoperative in the context of litigation, as under the common law no such excess funds would ever be recovered in enforcement actions. See *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998) (statute must be construed so that no part is inoperative or superfluous).[8]

In view of art. 9's comprehensive scheme for recovery and distribution of funds due pursuant to an assignment and notification thereof, we conclude that art. 9 displaces the common law on the question of the measure of a secured creditor's recovery under G. L. c. 106, § 9-405. Where an account debtor receives notification of an assignment but nonetheless makes payments

---

[8]Suffolk argues that art. 9 is not primarily a litigation statute but rather "the playbook that governs the ordinary course of dealing between debtors and secured creditors." It contends that, under its view, the provisions of G. L. c. 106, § 9-608 (*a*), directing disbursement of surplus funds are not superfluous, as they remain applicable where the account debtor complies with art. 9 and makes voluntary payments resulting in a surplus. We find this argument unpersuasive, as G. L. c. 106, § 9-608 (*a*) (1), explicitly details a scheme for distribution of "cash proceeds of collection *or enforcement* under Section 9-607" (emphasis added). Moreover, G. L. c. 106, § 9-607 (*d*), specifically provides for the deduction of attorney's fees and legal expenses incurred by the assignee in enforcing the obligations of the account debtor, indicating that the Legislature intended G. L. c. 106, § 9-607, to apply to litigation. See comment 10 to UCC § 9-607, 3 U.L.A. 664 (Master ed. 2010) ("The phrase 'reasonable attorney's fees and legal expenses,' which appears in subsection [d], includes only those fees and expenses incurred in proceeding against account debtors or other third parties"). Suffolk's argument ignores the fact that G. L. c. 106, § 9-608 (*a*), applies unambiguously to enforcement actions.

to the assignor, it remains obligated in full under the operative contract. G. L. c. 106, § 9-405 (*a*). Accordingly, the proper measure of the assignee's recovery under G. L. c. 106, § 9-405, is the total value of all payments wrongfully misdirected.[9] Here, the jury found Suffolk liable under art. 9 for wrongful misdirection of ten checks totaling $3,015,000.49. The judge properly entered judgment against Suffolk in this amount.

There is no question that application of art. 9 on these facts leads to a harsh result, because Suffolk is obligated to pay the bank nearly six times the bank's actual loss as determined by the jury. However, the result is neither illogical nor absurd; the Legislature has ensured against a windfall to assignees like the bank by mandating that they disburse recovered funds in excess of their actual losses plus reasonable expenses of collection and enforcement. See G. L. c. 106, § 9-608 (*a*) (1) (A), (4). Cf. *Fulton County* v. *American Factors of Nashville, Inc.*, 250 Ga. App. 366, 371 (2001) ("The double payment is not punitive but simply the legal consequence of the [account debtor's] payment

___

[9]The parties have not called our attention to, nor are we aware of, any cases deciding this precise question. To the extent the issue has been addressed by courts in other jurisdictions, the majority of such courts have treated the issue in a manner consistent with our conclusion. See, e.g., *Estate of Haas* v. *Metro-Goldwyn-Mayer, Inc.*, 617 F.2d 1136, 1139 (5th Cir. 1980) ("if an account debtor fails to follow the dictates of a valid assignment and improperly pays the assignor, the account debtor must answer to the assignee with a 'double payment' in the amount of the improper payment"); *District of Columbia* v. *Thomas Funding Corp.*, 593 A.2d 1030, 1034 (D.C. 1991) ("Under Article 9, the account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due has been assigned and that payment is to be made to the assignee. . . . If thereafter the account debtor continues to pay the assignor, the debtor will remain liable to the assignee for the same amount" [citation omitted]); *MP Star Fin., Inc.* v. *Cleveland State Univ.*, 107 Ohio St. 3d 176, 178 (2005) ("when an account debtor makes payments to an assignor of an account receivable after the account debtor has received notice of an assignment, the account debtor is still liable to the assignee for the payments made to the assignor").

We are not persuaded to the contrary by *Robert Parker's Truck & Trailer Repair, Inc.* v. *Speer*, 722 S.W.2d 45 (Tex. Ct. App. 1986), on which Suffolk relies. There, the account debtor wrongfully misdirected payments totaling $138,593 to the assignor, but the assignee's loss was only $86,603.35. *Id.* at 47. Judgment entered in the amount of $86,603.35, *id.* at 46, and the court affirmed the judgment. *Id.* at 49. However, it did so without any discussion of the proper measure of recovery, as none of the appellant's points of error raised this issue. *Id.* at 47-49.

to the wrong party over notice. Under appropriate circumstances, legal redress is available to one making a payment in error").

Although G. L. c. 106, § 9-608, directs disbursement of excess funds first to subordinate creditors of the assignor and then to the assignor, rather than to the account debtor, Suffolk nonetheless has recourse to mitigate the excessive loss occasioned by double payment. It may bring suit against the subcontractor, its trustees, or successors to recover the misdirected payments, and thereby establish itself as a subordinate creditor in line for disbursement of excess funds recovered by the bank. See *National Trade Trust, Inc.* v. *Merrimac Constr.*, 524 N.W.2d 14, 17 (Minn. Ct. App. 1994) ("Merrimac [account debtor] must pay the $19,418 [the full amount of the misdirected payment] to National [assignee] . . . . Merrimac's recourse is to proceed against Heart Drywall [assignor] for that $19,418 . . . . Neither party here is prejudiced by this reversal. Its net effect is that Merrimac, rather than National, has to suffer the possibility that Heart Drywall is insolvent. That penalty must rest with Merrimac because it paid Heart Drywall in the face of a valid assignment . . .").

b. *Mitigation of damages.* Suffolk contends that the judge erred in determining that the bank's recovery would not be offset by the amount of the Fox guaranty. It maintains that, because the bank had an "unfettered right" to apply the Fox guaranty to the subcontractor's debt, the bank's recovery under the UCC should be reduced by the amount of the guaranty, pursuant to the common-law doctrine of mitigation of damages.[10] See *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 586 (1982) ("The general rule with respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part"). "[A] judge's legal conclusions are reviewed de novo." *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004).

As discussed *supra*, the bank's actual damages are irrelevant to the sum Suffolk must pay under G. L. c. 106, § 9-405.

---

[10]Suffolk argues as well that the bank's contract damages should be reduced by the amount of the Fox guaranty. Given the result we reach, we need not address this argument, as the bank has stated that it will not seek recovery of contract damages upon affirmance of the UCC judgment. See note 5, *supra*.

Regardless of whether the bank applied the Fox guaranty to the subcontractor's debt, art. 9 authorizes the bank to recover from Suffolk the full value of all wrongfully misdirected payments, see G. L. c. 106, §§ 9-405, 9-607, even if it ultimately may not retain recovered funds exceeding its actual loss plus costs. See G. L. c. 106, § 9-608 (*a*).

Further, under the UCC, a secured creditor's rights and remedies upon a debtor's default are cumulative and may be pursued simultaneously or in whichever order the creditor chooses. See G. L. c. 106, § 9-601 (*c*) (secured party's "rights . . . are cumulative and may be exercised simultaneously"); G. L. c. 106, § 1-201 (36) (" 'Rights' includes remedies"). See J.J. White & R.S. Summers, Uniform Commercial Code § 34-4, at 414 (6th ed. 2010) ("a secured creditor may first attempt to enforce its rights by one method, and if that proves unsuccessful follow another one"). Although the bank had an "unfettered right" to apply the Fox guaranty to the subcontractor's debt, it was under no obligation to do so, and it was free to pursue other means of recovery. See *First Republic Corp. of Am.* v. *BayBank*, 424 Mass. 704, 707-708 (1997) (rejecting argument that secured creditor must look to collateral before obtaining judgment); T.B. Merritt, Consumer Law § 20:63, at 181 (3d ed. 2010) ("the creditor has a choice of remedies, and, for example, is not required first to repossess the collateral before instituting a lawsuit on the debt and obtaining a judgment and execution").

Because an assignee's actual damages are irrelevant to the sum an account debtor must pay under G. L. c. 106, § 9-405, and because secured creditors' rights and remedies are cumulative and may be exercised simultaneously, we conclude that the common-law doctrine of mitigation of damages does not apply to claims brought under G. L. c. 106, § 9-405. Accordingly, the judge properly declined to offset the bank's recovery by the amount of the Fox guaranty.

c. *Estoppel.* The bank asserts that its motion for partial judgment notwithstanding the verdict was denied improperly; it contends as a matter of law that it is not estopped from recovering as to the eleventh and twelfth payments Suffolk made to the subcontractor. In reviewing the denial of a motion for judgment

notwithstanding the verdict, we ask whether, viewed in the light most favorable to the nonmoving party, the evidence is sufficient to support the verdict. *O'Brien* v. *Pearson*, 449 Mass. 377, 383 (2007). We must evaluate whether any of the evidence before the jury could support a reasonable inference in favor of the nonmovant. *Id.* "To be reasonable, the inference [or conclusion] 'must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.' " *Cahaly* v. *Benistar Prop. Exch. Trust Co.*, 451 Mass. 343, 350, cert. denied sub nom. *Benistar Ltd.* v. *Cahaly*, 555 U.S. 1047 (2008), quoting *Phelan* v. *May Dep't Stores, Co.*, 443 Mass. 52, 55 (2004).

To establish estoppel, a party must show "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Bongaards* v. *Millen*, 440 Mass. 10, 15 (2003). Silence may satisfy the first element of estoppel where it constitutes a representation of consent. See *Tracy* v. *Lincoln*, 145 Mass. 357, 359-360 (1887) (plaintiff's silence as she watched her husband mortgage her property to defendant estopped her from later claiming ownership as against mortgagee).

Here, there was evidence that the checks Suffolk issued to the subcontractor were deposited in the subcontractor's savings account with the bank; that at some point after Suffolk began issuing checks to the subcontractor, the subcontractor's president spoke with the bank's vice-president about depositing the Suffolk checks; and that, prior to Suffolk issuing the last two checks, the bank's vice-president may have attended a grand opening celebration for the furniture store, suggesting that she was aware that the construction job was complete and that payments had presumably been made on the HVAC subcontract. This evidence was sufficient for the jury to infer that, prior to Suffolk issuing the last two checks to the subcontractor, the bank knew that Suffolk was paying the subcontractor directly. In the face of such knowledge, the bank's lack of objection arguably constituted consent to Suffolk's method of payment. However, there was no evidence presented that the bank's silence was communicated

to Suffolk. In other words, there is no indication that the bank made a representation of consent *to Suffolk*, as required under the first element of estoppel. See *Bongaards* v. *Millen*, *supra.*

Even if we were to assume that the first element of estoppel is satisfied, Suffolk points to no evidence before the jury sufficient to satisfy the second element of estoppel — namely, that Suffolk made the last two payments to the subcontractor in reliance on the bank's silence. See *id.* Specifically, there is no evidence that anyone at Suffolk was ever made aware of the bank's silence. If Suffolk was never made aware of the bank's silence, it could not have acted in reliance upon it. See *Tracy* v. *Lincoln*, *supra* at 359 (plaintiff is estopped only where her conduct "is in fact acted upon by another"). The evidence indicates that the Suffolk employees responsible for making payments under the HVAC subcontract did not know, at the time the checks were issued to the subcontractor, that an assignment had even been made, that Suffolk had received notification of the assignment, or that Suffolk had agreed in writing to pay the bank directly. Such evidence does not permit a reasonable inference that Suffolk acted in reliance on the bank's silence as a manifestation of consent.

We recognize that "nullifying a jury verdict is a matter for the utmost judicial circumspection." *Cahaly* v. *Benistar Prop. Exch. Trust Co.*, *supra.* Nevertheless, a verdict cannot stand if it is not supported by the evidence. *Id.* Because there was no evidence presented to suggest that Suffolk acted in reliance on the bank's silence when it issued the eleventh and twelfth checks to the subcontractor, we conclude that it was error to deny the bank's motion for partial judgment notwithstanding the verdict.

3. *Conclusion.* For the reasons set forth above, we affirm the judgment in part and reverse in part. We affirm the judge's ruling on the measure of recovery under G. L. c. 106, § 9-405, and his decision declining to offset the bank's recovery by the amount of the Fox guaranty. We reverse the denial of the bank's motion for partial judgment notwithstanding the verdict and remand to the Superior Court for entry of judgment against Suffolk as to all twelve payments.

*So ordered.*