Filed 12/2/25  REV Capital v. ALO CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| REV CAPITAL, INC., | B340812 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 24STCV03957) |
| v. | |
| ALO, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

Miller Nash, Bernie Kornberg and Nicole M. McLaughlin for Defendants and Appellants.

Levinson Arshonsky Kurtz & Komsky, Steven N. Kurtz and Paul G. Murtagh for Plaintiff and Respondent.

———————————

Defendants ALO, LLC (ALO) and Bella+Canvas LLC (Bella+Canvas) appeal the trial court's order granting REV Capital (California) Inc.'s (REV) applications for pretrial right to attach orders. Defendants contracted with nonparty Baron HR West, Inc. (Baron) for staffing services. Pursuant to a factoring and security agreement between Baron and REV, Baron assigned defendants' accounts receivable to REV and notified defendants they could only satisfy their payment obligations by paying REV directly. Defendants later made a series of payments to Baron. REV filed this action against defendants, alleging REV alone was entitled to receive defendants' payments for their accounts with Baron pursuant to California Uniform Commercial Code sections 9201, 9406, and 9607.[1] REV then filed applications for right to attach orders under Code of Civil Procedure section 483.010, which sought to attach the amounts of the misdirected payments, accrued interest, and fees and costs. The trial court granted these applications in part.

Code of Civil Procedure section 483.010, subdivision (a), provides that a trial court may issue an attachment in an action on a claim for money based upon a contract, express or implied, for a fixed or readily ascertainable amount. Defendants contend REV's claims were not based upon a contract because there is no contractual privity between defendants and REV, and REV's claims rely on provisions of the California Uniform Commercial

---

[1] To distinguish between our Commercial Code and the Uniform Commercial Code (UCC), which has been adopted in some form in every state, we refer to our code as the California Uniform Commercial Code. (*Bank of America v. Lallana* (1998) 19 Cal.4th 203, 206 (*Lallana*).) All further undesignated statutory references are to the California Uniform Commercial Code.

Code.  They further contend that REV's claims were not for a fixed or readily ascertainable amount because REV did not establish that it purchased their accounts from Baron, and because the factoring and security agreement between Baron and REV was not a sale but a disguised loan.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

REV is a company that provides various financing services to its customers, including factoring, which involves the purchase of accounts from businesses.  In factoring, the factor provides funds to its clients by purchasing the client's accounts for a percentage of the account's value.  The factor may also take a security interest in the client's assets, including its accounts, to secure repayment of the client's obligations.  The factor may notify the client's customers, referred to as account debtors, that the client's accounts have been assigned to the factor for payment and all obligations owed to the client are to be paid directly to the factor.

Defendants manufacture clothing.  In June 2022, Bella+Canvas and Baron entered into a staffing agreement, pursuant to which Baron provided temporary staffing services and billed Bella+Canvas according to agreed-upon rates.  Although ALO was not a signatory to the staffing agreement, defendants are related entities and do not dispute they both entered into written agreements with Baron for staffing services.

In October 2023, REV and Baron entered into a factoring and security agreement.  The agreement stated that Baron "shall offer to sell to [REV], as absolute owner with full recourse and all right, title and interest thereunder, all of [Baron's] Accounts arising in the ordinary course of [Baron's] business."  REV could, but was not required to, purchase from Baron accounts it deemed

eligible. For accounts REV elected to purchase, REV paid 92 percent of the face amount of the account. Baron, in turn, was required to pay REV a factoring fee.

As security for Baron's obligations under the agreement, Baron also granted REV "a continuing first priority security interest in the Collateral," which was defined as "[a]ll of [Baron's] now owned and hereafter acquired assets, including without limitation all Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, and General Intangibles." The agreement stated: "Notwithstanding the creation of this security interest, the relationship of the Parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower."[2]

The factoring and security agreement further provided that Baron authorized REV to exercise various rights until all obligations under the agreement had been paid in full, including "receiv[ing], tak[ing], endor[sing], assign[ing], deliver[ing], accept[ing] and deposit[ing], in the name of [REV] or [Baron], proceeds of any Collateral," and "[t]ak[ing] or bring[ing], in the name of [REV] or [Baron], all steps, actions, suits, or proceedings deemed by [REV] necessary or desirable to effect collection of or other realization upon any Purchased Account."

Several days after Baron and REV entered into the factoring and security agreement, Baron sent defendants a notice

---

[2] Baron previously assigned its accounts receivable to Amerisource Funding, Inc. Amerisource filed UCC-1 financing statements to perfect its security interests in collateral pledged by Baron, which consisted of all Baron's assets. After Baron and REV entered into the factoring and security agreement, Amerisource filed a UCC financing statement amendment, which reflected that Amerisource assigned its rights to REV.

4

of assignment stating that Baron had assigned its accounts receivable to REV in accordance with Article 9 of the UCC. Effective immediately, Baron "irrevocably direct[ed] and authorize[d]" defendants to make all payments on accounts receivable owed to Baron payable to REV. The notice warned that "[p]ayment to anyone other than REV Capital or its designee will not constitute payment of Accounts Receivable owed to [Baron]."

Defendants' accounts payable manager signed the notice of assignment, confirming receipt. ALO thereafter paid REV approximately $3,620.34, and Bella+Canvas paid REV approximately $456,172.43.

A different entity, Dynasty Capital, subsequently demanded that defendants send amounts they owed Baron directly to Dynasty Capital. In November 2023, Baron's legal counsel informed defendants that Dynasty Capital did not hold a UCC position that would entitle it to their payments and instructed defendants to make all payments directly to Baron. Defendants did not clarify the conflicting instructions with REV.

From December 1 to 20, 2023, defendants made seven payments directly to Baron, which totaled $2,542,114.56 ($2,472,209.52 from Bella+Canvas and $69,905.04 from ALO).

In February 2024, REV filed an action against defendants. In the operative first amended complaint, REV asserted causes of action for breach of contract, services rendered, breach of statutory duty to pay, and account stated. REV sought an accounting and declaratory relief. Pursuant to sections 9201, 9406, and 9607, REV alleged it alone was entitled to receive defendants' payments for their accounts with Baron.

5

In April 2024, REV filed applications for right to attach orders against defendants. It requested a writ of attachment against ALO in the amount of $97,110.86, which included the $69,905.04 paid to Baron after ALO received the notice of assignment, $2,205.82 in accrued interest, and $25,000 in estimated attorney fees and costs; and against Bella+Canvas in the amount of $2,576,853.51, which included the $2,472,209.52 paid to Baron after ALO received the notice of assignment, $79,643.99 in accrued interest, and $25,000 in estimated attorney fees and costs.

In May 2024, defendants opposed the application for right to attach orders.[3] Defendants argued REV's action against them was not based on a contract because REV sought to enforce the parties' alleged rights and responsibilities under the UCC. Defendants further asserted REV was unlikely to prevail because it failed to show it was a secured creditor of Baron and the factoring and security agreement was a loan, not a sale. Defendants also argued REV's claims against defendants were not ascertainable because REV had not established the amount Baron owed REV and, even if it had, the amount would have to be reduced by the amount defendants were entitled to recoup for Baron's breaches of the staffing agreement.

In reply, REV argued defendants failed to offer any evidence to contradict REV's claim that Baron had assigned its accounts to REV. REV asserted it held the sole right to payment on defendants' accounts as both owner and holder of a perfected security interest in the accounts. It also contended defendants had no right to any offset or recoupment under section 9406

---

[3]    Also in May 2024, Baron and a related entity filed petitions for bankruptcy in the Central District of California.

6

because they had already made payments to Baron and, in any event, had failed to provide evidence of a claim for offset or recoupment.

In June 2024, the trial court issued its ruling on the applications for right to attach orders. The court concluded Code of Civil Procedure section 483.010 does not require that the plaintiff be the party to a contract with defendants, only that plaintiff's claim is based on an express or implied contract. It was sufficient for purposes of the statute that REV's claims were based on amounts defendants owed under their staffing agreements with Baron.

The trial court found that REV's claims had probable validity. Pursuant to the factoring and security agreement, REV purchased Baron's accounts and could bring an action to collect on any account it purchased. REV also obtained a first priority security interest in Baron's accounts. Defendants received the notice of assignment stating that payments should be remitted directly to REV. Thus, REV was entitled to collect on Baron's accounts under section 9406, subdivision (a), and the amount of the misdirected payments was a fixed amount.

The trial court also concluded the terms of the factoring and security agreement belied defendants' contention that the agreement was for financing and not a sale of accounts. It observed the agreement expressly stated that the relationship of the parties was that of purchaser and seller, notwithstanding the creation of the security interest. It found defendants' payments to REV pursuant to the notice of assignment demonstrated their acknowledgment that REV purchased their accounts.

The trial court partially granted REV's application. It reduced the amount for fees and costs to $12,500 for each

7

defendant.  It also reduced the amount to be attached as to
Bella+Canvas by $90,299.21 based on amounts Bella+Canvas
paid to a third party staffing company for labor costs after Baron
failed to pay temporary employees.  In July 2024, the court issued
the right to attach orders and orders for issuance of writ of
attachment against Bella+Canvas in the amount of $2,474,054.30
and against ALO in the amount of $84,610.86.

Defendants timely appealed.

## DISCUSSION

## I.   The Trial Court Correctly Granted REV's Application for Right To Attach

Defendants contend the court erred in issuing the right to
attach orders because REV failed to satisfy the requirements of
Code of Civil Procedure section 483.010, subdivision (a), in two
respects.  First, defendants contend REV's claims are not based
upon a contract because they rely on provisions of the California
Uniform Commercial Code.  Second, they contend REV's claims
are not for a fixed or readily ascertainable amount because REV
failed to establish the amounts Baron owed to REV or that Baron
assigned defendants' accounts to REV.  Defendants assert that
the factoring and security agreement was a disguised loan, rather
than a true sale, therefore REV could only recover from
defendants the amounts Baron owed REV.

We reject these arguments and conclude the trial court
properly issued the right to attach orders.

### A.   Standard of review and relevant legal principles

"California's Attachment Law (Code Civ. Proc., § 482.010 et
seq.) is purely statutory and is strictly construed."  (*Kemp Bros.
Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th

8

1474, 1476, fn. omitted.) "Except as otherwise provided by statute, an attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest, and attorney's fees." (Code Civ. Proc., § 483.010, subd. (a).) "Although damages need not be liquidated, they must be measurable by reference to the contract sued upon, and their basis must be reasonable and certain. [Citations.] . . . ' " '[T]he contract sued on must furnish a standard by which the amount due may be clearly ascertained and there must exist a basis upon which the damages can be determined by proof.' " ' [Citation.]" (*Kemp*, at p. 1481, fn. 5.)

Additionally, "[a] party seeking a prejudgment attachment must demonstrate the probable validity of its claim. ([Code Civ. Proc.,] § 484.090, subd. (a).) Probable validity means that 'more likely than not' the plaintiff will obtain a judgment on that claim. ([*Id*.,] § 481.190.)" (*Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal.App.5th 881, 885.)

"A trial court's factual findings in an attachment proceeding . . . are subject to our substantial evidence standard of review. [Citations.] 'We review the evidence on appeal in favor of the prevailing party, resolving conflicts and drawing reasonable inferences in support of the judgment.' [Citations.] '[W]e cannot substitute our inferences for those of the trial court reasonably grounded on substantial evidence.' [Citations.]" (*Pech v. Morgan* (2021) 61 Cal.App.5th 841, 855.) " 'However, where there are no contested issues of fact, the issue becomes one of law subject to de novo review.' [Citations.] To the extent issuance of a[ ] [prejudgment right to attach order] raises questions of statutory

9

interpretation, our review is de novo." (*Park v. NMSI, Inc.* (2023) 96 Cal.App.5th 346, 354.)

### B. REV's claims are based upon a contract

Defendants contend that REV's claims are not "based upon a contract, express or implied" as required by Code of Civil Procedure section 483.010, subdivision (a), because defendants and REV are not in contractual privity and REV's claims against defendants do not arise solely from the staffing agreements. We disagree.

We first examine the plain meaning of "based upon a contract." (Code Civ. Proc., § 483.010, subd. (a).) "Base" means "to find a foundation or basis for . . . usually used with *on* or *upon*" in its verb form, and "the fundamental part of something" in its noun form. (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/base> [as of Dec. 1, 2025], archived at <https://perma.cc/C3FD-32UC>.) The statutory language thus indicates that a contract must form a foundational or fundamental part of the claim for which attachment is sought. The statute does not, as defendants suggest, state that the party seeking an attachment must be in contractual privity with the party against which attachment is sought. Nor does it state the claim cannot be based on a statute. Indeed, courts have concluded that attachment may issue on a statutory claim that is contractual in nature. (E.g., *Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 854 [statutory claim to recover compensation paid to unlicensed contractor "fundamentally contractual in nature since it is based on an unlicensed contractor's agreement with the beneficiary to provide services, and the beneficiary's agreement to pay for same"]; see also 6 Witkin, Cal. Procedure (6th ed. 2025) Provisional

10

Remedies, § 63 ["Some statutory obligations are treated as contractual in nature, and attachment is allowed."].)

REV's first amended complaint asserts causes of action for breach of contract, services rendered, breach of statutory duty to pay, account stated, and accounting based on allegations that: 1) defendants and Baron were parties to staffing agreements; 2) in the factoring and security agreement, Baron assigned the contractual right to payment under the staffing agreements to REV and granted REV a continuing first priority security interest in collateral, including Baron's accounts; and 3) pursuant to sections 9201, 9406, and 9607, REV was entitled to receipt of payments from defendants.

Section 9201, subdivision (a), states "a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."[4]  Official comment 2 to UCC section 9-201 further provides "a security agreement is effective between the debtor and secured party and is likewise effective against third parties."  Section 9406, subdivision (a), provides that "an account debtor on an account . . . may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, signed by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the

---

[4]  " 'Security agreement' means an agreement that creates or provides for a security interest."  (§ 9102, subd. (a)(74).) " 'Secured party' means . . .  [¶] . . . [a] person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding."  (*Id*., subd. (a)(73).)

11

assignee."[5]  Through the notice of assignment, Baron informed defendants they could only satisfy their payment obligations under the staffing agreements by paying REV directly.

Section 9607, subdivision (a)(3), provides that, upon the agreement of the parties, or in the event of default, a secured party may "[e]nforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor . . . ."  Pursuant to the factoring and security agreement, Baron and REV agreed that REV had the right to "[t]ake or bring, in the name of [REV] or [Baron], all steps, actions, suits or proceedings deemed by [REV] necessary or desirable to effect collection of or other realization upon any Purchased Account."  Thus, REV was

---

[5]  " 'Account,' . . . means a right to payment of a monetary obligation, whether or not earned by performance . . . (ii) for services rendered or to be rendered . . . ."  (§ 9102, subd. (a)(2).)  " 'Account debtor' means a person obligated on an account, chattel paper, or general intangible."  (*Id*., subd. (a)(3).)  " 'Assignee,' . . . means a person (A) in whose favor a security interest that secures an obligation is created or provided for under a security agreement, whether or not the obligation is outstanding or (B) to which an account, chattel paper, payment intangible, or promissory note has been sold.  The term includes a person to which a security interest has been transferred by a secured party."  (*Id*., subd. (a)(82).)  " 'Assignor' means a person that (A) under a security agreement creates or provides for a security interest that secures an obligation or (B) sells an account, chattel paper, payment intangible, or promissory note.  The term includes a secured party that has transferred a security interest to another person."  (*Id*., subd. (a)(83).)

empowered to bring this suit to collect on payments due under the staffing agreements.

In sum, the staffing agreements created and determined the amount of the obligations REV is suing to enforce and are therefore a fundamental part of REV's claims. Section 9406 limited how defendants could satisfy their obligations under the staffing agreements after they received the notice of assignment, but did not alter the amounts due under those agreements. Similarly, section 9607 permits REV to enforce Baron's rights under the staffing agreements but does not create new rights or alter existing rights. Indeed, subdivision (e) expressly states that section "does not determine whether an account debtor, bank, or other person obligated on collateral owes a duty to a secured party." (§ 9607, subd. (e); cf. *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n* (S.D.N.Y. 2014) 27 F.Supp.3d 494, 505 [New York equivalent of § 9607 "does not create any obligation to a secured party"].)[6]

Defendants contend *De Mirjian v. Ideal Heating Corp.* (1949) 91 Cal.App.2d 905 (*De Mirjian*), compels the opposite

---

[6]     "Case law from other jurisdictions applying our Commercial Code, the Uniform Commercial Code, or the uniform code of other states, is considered good authority in litigation arising under the California act." (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 166, fn. 3; accord, *Lallana, supra*, 19 Cal.4th at p. 212 [relying on decisions from other jurisdictions when interpreting Cal. U. Com. Code]; *Oswald Machine & Equipment, Inc. v. Yip* (1992) 10 Cal.App.4th 1238, 1247 ["one important purpose of the Uniform Commercial Code is to make uniform the law among the various jurisdictions . . . we generally afford great deference to the decisions of our sister jurisdictions interpreting its provisions"].)

conclusion. In *De Mirjian*, the plaintiffs were the owners of property that was damaged by a fire that started on a property the defendant leased from plaintiffs' predecessor in interest. (*Id*. at p. 907.) The complaint asserted causes of action purportedly based on the terms of the defendant's lease, which provided that the " 'Lessee agrees to hold Lessors and said premises free and harmless from any damage resulting from the use, misuse or neglect thereof and all appurtenances thereto.' " (*Ibid*.) The trial court denied the defendant's motion to discharge an attachment levied upon its bank account. (*Ibid*.)

The appellate court held this was error. (*De Mirjian, supra*, 91 Cal.App.2d at p. 908.) The court concluded it was "manifest that plaintiffs' complaint sounds in tort and not in contract" where the plaintiff's claim "stem[med] from alleged tortious negligence." (*Id*. at pp. 909–910.) Except for a claim for attorney fees, there were "no allegations tending to indicate any basis of liability arising solely out of the contract or out of any source other than the law of torts." (*Id*. at p. 910.) Although the lease agreement created the relationship between the parties, "defendant's duty to exercise reasonable care, and to respond in damages for a failure to do so, were imposed by force of law, independent of any contract or the terms thereof." (*Ibid*.)

*De Mirjian* does not support the contention that REV's claims are not contractual in nature. The defendant in *De Mirjian* could be held liable for the tort of negligence in the absence of the lease agreement, whereas defendants' liability to REV does not exist independently of defendants' staffing agreements with Baron.

Defendants rely on *In re Kody Branch of California, Inc.* (Bankr. C.D. Cal. 2024) 657 B.R. 120 (*In re Kody*), for the

14

proposition that attachment may not lie if the claim arises out of a statutory violation, even if the amount of damages is determined by reference to a contract.  The issue in *In re Kody* was "[w]hether a preference claim under 11 U.S.C. § 547 may serve as the basis for a prejudgment attachment . . . ."  (*Id.* at p. 123.)  The bankruptcy court held the "preference claim under 11 U.S.C. § 547 sounds in tort rather than in contract because 'it seeks damages for violation of a statutory duty,' that is, not to make transfers of the debtor's property preferring one creditor over the others."  (*Id.* at p. 124.)

The *In re Kody* court relied heavily on *Cate v. Stapleton* (1941) 43 Cal.App.2d 492, a case concerning a preference claim under the former Bankruptcy Act.  The appellate court in *Cate* observed that " '[n]ot all statutory obligations or liabilities are contractual, although in many cases . . . a party is deemed to contract in view of existing statutes, even to the extent that these become a part of his contract.' "  (*In re Kody*, *supra*, 657 B.R. at p. 125, quoting *Cate*, at p. 494.)  It concluded the provisions of the former Bankruptcy Act at issue were " 'not based upon any contractual obligation, but upon the theory that a wrongful act has been committed which interferes with the rights of other creditors.' "  (*In re Kody*, at p. 126, quoting *Cate*, at p. 496.)  Because it was " 'not necessary to show that there was any agreement or arrangement between the parties to the preference,' " the *Cate* court concluded that " '[i]n practical effect the action sounds more in tort than in contract, being based upon the wrongful act of the parties, resulting in harm to others, when they had knowledge of the conditions at the time they acted.' "  (*In re Kody*, at p. 126, quoting *Cate*, at p. 496.)  The bankruptcy court adopted this reasoning, and held the "preference claim

must be denied because attachment under applicable California law does not apply to a noncontract tort-based claim, such as Plaintiff's preference claim." (*In re Kody*, at p. 128.)

Here, in contrast, defendants' payment obligations were not created by statute. As discussed, section 9607 does not create any substantive rights. Rather, REV must show there is an agreement between defendants and Baron and it is entitled to enforce defendants' payment obligations under that agreement. REV's claims cannot be fairly characterized as noncontract tort-based claims.

Because we conclude that REV's claims are based upon a contract, notwithstanding their reliance on the California Uniform Commercial Code, we need not consider whether REV could enforce the staffing agreement as an assignee under common law. Moreover, as no uncertainty exists in the plain meaning of the statute, it is unnecessary for us to consider whether public policy favors defendants' interpretation of the statute.

C. **Substantial evidence supports the trial court's finding that REV's claims are for a fixed or readily ascertainable amount**

Defendants contend the trial court erred in finding REV's claims are for a fixed or readily ascertainable amount because there was no substantial evidence that REV purchased defendants' accounts receivable from Baron. They additionally assert REV failed to establish that Baron owed REV funds and, further, that the factoring and security agreement was a disguised loan rather than a sale. They argue—without citation to authority—that if the factoring and security agreement was a loan, "Rev is only entitled to the Misdirected Payments if sums

16

remained owed to it under the Financing Agreement. If the obligations were paid in full, Rev had no right to further payment." We disagree.

Defendants argue that the factoring and security agreement is not proof that REV purchased defendants' accounts because the agreement gave REV the option to purchase eligible accounts, but did not require it to do so. However, the notice of assignment informed defendants that Baron had assigned all of its accounts receivable to REV and "irrevocably direct[ed] and authorize[d] [defendants] to make all payments on Accounts Receivable owed to [Baron] payable to REV Capital or to whomever REV Capital may so direct." It also stated that "[p]ayment to anyone other than REV Capital or its designee will not constitute payment of Accounts Receivable owed to [Baron]." This was consistent with the factoring and security agreement, which provided that "Seller shall instruct all Payers to make payments, and otherwise cooperate to ensure that all Payers make payments, directly to Purchaser in accordance with the provisions" of the agreement.[7] Defendants made several payments directly to REV pursuant to the notice of assignment, and nothing in the record suggests Baron disputed that REV was entitled to those payments. This constitutes substantial evidence supporting the trial court's conclusion that Baron assigned defendants' accounts to REV.

We next consider defendants' argument that the factoring and security agreement was a loan disguised as a sale of accounts. Defendants fail to establish that this distinction affects the application of the California Uniform Commercial Code

---

[7]     The factoring and security agreement defines "Payer" as an account debtor.

17

provisions on which REV's claims rely. Assembly Committee comment 26 to section 9102 provides that the "terms 'assignment' and 'assign' . . . refer to transfers of rights to payment, claims, and liens and other security interests." (Assem. Com. com., West's Ann. Com. Code (2024) com. 26, foll. § 9102; cf. 9 Hawkland UCC Series, § 9-406:1 (2024) ["[T]he term 'assignee' in Article 9 [of the UCC] includes not only an outright transferee but also a lender holding a security interest in the receivable as security for an obligation."].) Section 9109 provides that Division 9 of the California Uniform Commercial Code applies both to transactions that create a security interest in personal property or fixtures by contract and sales of accounts, including sales of enforcement rights. (§ 9109, subd. (a)(1), (3); Assem. Com. com., West's Ann. Com. Code (2015) com. 5, foll. § 9109.)

Accordingly, courts have rejected the contention that provisions substantively identical to sections 9406 and 9607 do not apply where the assignor only granted the assignee a security interest in accounts payable. (E.g., *First State Bank Nebraska v. MP Nexlevel, LLC* (2020) 307 Neb. 198, 210, 211 [" 'assignment' under [UCC] article 9 includes both an outright transfer of ownership and a contingent transfer for security"; there exists "no convincing justification for limiting the use of 'assignment' . . . when there is a presently exercisable security interest"]; *Swift Energy Operating, L.L.C. v. Plemco-South, Inc.* (La.Ct.App. 2015) 157 So.3d 1154, 1161–1162 [trial court erred in holding Louisiana equivalent of § 9406 did not apply where the assignor's "accounts payable had not been transferred in ownership to [the assignee] and were nothing more than collateral security"].) In other words, regardless of whether an agreement reflects a sale of

accounts or a loan for which the accounts are the secured collateral, section 9406 gives the assignee the right to receive the payments the account debtor would otherwise owe to the assignor and section 9607 gives the assignee the right to enforce the account debtor's obligations. Here, it is undisputed that REV had a security interest in defendants' accounts receivable pursuant to the factoring and security agreement.

The California cases on which defendants rely in support of their claim that the factoring and security agreement was a disguised loan do not concern claims brought under the California Uniform Commercial Code. Instead, they address claims of usury, or disputes as to whether a property deed was a sale or mortgage. Likewise, with one exception, the federal cases defendants cite either do not mention the UCC, or do so only in passing. Only *In re Shoot the Moon, LLC* (Bankr. D. Mont. 2021) 635 B.R. 797, discusses Article 9 of the UCC. In that case, the bankruptcy court noted the drafters of the article "recognize[d] that '[i]n many commercial financing transactions the distinction [between selling receivables and borrowing against receivables] is blurred.' In light of this, Article 9 treats both secured loans and 'a sale of accounts, chattel paper, payment intangibles, or promissory notes' as secured transactions subject to that statute's detailed rules regarding perfection and priority." (*In re Shoot the Moon*, at pp. 812–813, fns. omitted.) However, the bankruptcy court had to determine whether transactions between the debtor and a cash advance company were sales of the debtor's future receivables or loans in order to decide: 1) whether the cash advance company acquired absolute ownership of the debtor's receivables or merely an interest in the receivables junior to other interests; 2) whether transfers to the cash advance

19

company were preferences and thus avoidable and recoverable; and 3) whether the cash advance company violated Montana usury law. (*Id.* at p. 811.) This case presents none of those issues.[8]

Defendants assert the California Uniform Commercial Code does not prohibit a court from determining if an alleged sale is a disguised loan. This is true, but irrelevant. As discussed, the relevant provisions of the California Uniform Commercial Code apply equally to transactions in which a receivable secures an obligation and those in which the receivable has been sold outright, and give REV the right to enforce defendants' payment obligations under the staffing agreements.

We next consider whether, under the California Uniform Commercial Code, REV was only entitled to recover amounts it had not received from Baron. *Reading Co-Op. Bank v. Suffolk Construction Co., Inc.* (2013) 464 Mass. 543 (*Reading*), is instructive. In *Reading*, the defendant construction company contracted with a subcontractor, which assigned the plaintiff bank its right to receive payment under its contract with the construction company as security for a line of credit. (*Id.* at pp. 544, 545.) The construction company received notification of the assignment and agreed to make payments directly to the bank, but instead made payments to the subcontractor. (*Id.* at p. 544.) The subcontractor subsequently ceased business operations with an outstanding debt to the bank. (*Ibid.*) The bank initiated an action against the construction company for

---

[8] Defendants contend in passing that "the amounts owed by Baron under the Factoring Agreement are likely void as arising entirely out of a usurious transaction." This unsupported assertion is insufficient to raise the issue of usury on appeal.

violation of the UCC. (*Ibid*.) The court entered judgment on the claim in the amount of the full face value of the misdirected payments for which the jury found liability. (*Ibid*.)

On appeal, the construction company argued that damages should be limited to the bank's actual damages as determined by the jury, which were substantially less than the amount of misdirected payments.[9] (*Reading*, *supra*, 464 Mass. at p. 547.) The Massachusetts Supreme Court rejected this argument. It explained that "[UCC] Article 9 contains a comprehensive scheme for enforcement of rights and allocation of losses" pursuant to which an account debtor who receives notification of assignment but nonetheless pays only the assignor "remains obligated in full under the contract." (*Id*. at pp. 549–550.) The court observed that the Massachusetts version of section 9608, which is substantively identical to California's section 9608, "provides a detailed framework for the distribution of funds recovered by an assignee from an account debtor," and the "statute's explicit anticipation of a possible surplus in recovery beyond the sum the assignee is ultimately entitled to retain is itself indication that the Legislature did not intend to limit recovery . . . to the assignee's actual loss." (*Reading*, at p. 550.) The court concluded that the UCC "displaces the common law on the question of the measure of a secured creditor's recovery" and requires that the

---

[9] "The jury's determination of the bank's actual damages reflect[ed] testimony as to which of the payments the bank would have retained and which it would have paid over to the subcontractor had the payments been properly directed, as well as testimony as to the sum that the bank recovered through other collection efforts." (*Reading*, *supra*, 464 Mass. at p. 547, fn. 4.)

21

account debtor remain liable in full.  (*Id.* at p. 552; see *id.* at p. 553.)

The *Reading* court also considered the argument that the bank's recovery should have been offset by a personal guaranty from one of the subcontractor's owners "because the bank had an 'unfettered right' to apply the . . . guaranty to the subcontractor's debt."  (*Reading, supra,* 464 Mass. at p. 554.)  The *Reading* court explained that the bank's actual damages were irrelevant to the amount it must pay and the UCC "authorizes the bank to recover from [the construction company] the full value of all wrongfully misdirected payments, [citations], even if it ultimately may not retain recovered funds exceeding its actual loss plus costs."  (*Id.* at p. 555.)  "[U]nder the UCC, a secured creditor's rights and remedies upon a debtor's default are cumulative and may be pursued simultaneously or in whichever order the creditor chooses.  [Citations.]  Although the bank had an 'unfettered right' to apply the . . . guaranty to the subcontractor's debt, it was under no obligation to do so, and it was free to pursue other means of recovery."  (*Ibid.*)

We find the *Reading* court's reasoning persuasive and conclude the trial court correctly determined that REV's claims were for a fixed or readily ascertainable amount consisting of the amount of defendants' misdirected payments.

Defendants claim that "[b]oth *Reading* and section 9608 are clear that a lender exercising its rights to collect on an account can receive no more than is owed."  Defendants fail to distinguish between what a secured party may recover in an enforcement action and what it may ultimately retain.  Section 9608 provides rules for the application of the proceeds of a collection under section 9607, including any surplus.  (See § 9608, subd. (a)(1)–

22

(4).)  It does not purport to limit what a secured party may recover under section 9607.  Thus, the *Reading* court held that the bank was entitled to recover the full value of misdirected payments from the construction company, even though the payments were nearly six times the bank's actual damages as determined by the jury.  (*Reading*, *supra*, 464 Mass. at p. 553.) The court acknowledged this was a "harsh result," but it was "neither illogical nor absurd," as the bank would be required to disburse recovered funds exceeding its actual losses plus reasonable expenses of collection and enforcement under the equivalent of section 9608, which prevented a windfall to assignees.  (*Reading*, at pp. 553–554.)

Finally, defendants argue that because the amount to be attached is "[t]he amount of the defendant's indebtedness claimed by the plaintiff" (Code Civ. Proc., § 483.015, subd. (a)(1)), REV cannot seek to attach more than the amounts owed to it by Baron.  Under section 9406, defendants could only discharge their obligations under the staffing agreements by paying REV after they received the notice of assignment.  Defendants' indebtedness is therefore the full amount of the misdirected payments, even if the amount Baron owes REV is ultimately less.

23

## DISPOSITION

The order is affirmed.  REV shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


EDMON, P. J.


EGERTON, J.